**Joyce RILEY, Plaintiff–Appellant,**

**v.**

**ST. LUKE'S EPISCOPAL HOSPITAL; Dr. Branislav Radovancevic; O. Howard Frazier, M.D.; Surgical Associates of Texas, P.A.; University of Texas Health Science Center at Houston; Baylor College of Medicine; Texas Heart Institute; and Edward K. Massin, M.D., Defendants–Appellees.**

No. 97–20948.

United States Court of Appeals,
Fifth Circuit.

Nov. 15, 1999.

---

for Frazier and Surgical Associates of Texas, PA.

Toni B. Hunter (argued), Austin, TX, for The University of Texas Houston Health Science Center.

William Joseph Boyce (argued), Warren S. Huang, Fulbright & Jaworski, Houston, TX, Martin H. Redish, Northwestern University School of Law, Chicago, IL, for Baylor College of Medicine.

Brian Patrick Johnson, Hanen, Alexander, Johnson & Spalding, Houston, TX, for Massin.

Brian Stuart Koukoutchos, Bedford, MA, Lisa R. Hovelson, Alan Marc Shusterman, Taxpayers Against Fraud, The False Claims Act Legal Center, Washington, DC, for Taxpayers Against Fraud, The False Claims Act Legal Center, Amicus Curiae.

Cathy M. Ventrell-Monsees, American Ass'n of Retired Persons, Washington, DC, for American Ass'n of Retired Persons, Nat. Health Law Program, Project on Government Oversight and Accountability Project, Amicus Curiae.

Dorothy Marie Siemon, Bruce B. Vignery, Michael Robert Schuster, American Ass'n of Retired Persons, Washington, DC, for American Ass'n of Retired Persons, Amicus Curiae.

James B. Helmer, Jr., Frederick Mason Morgan, Jr., Helmer, Lugbill, Martins & Morgan, Cincinnati, OH, for Nat. Employment Lawyers Ass'n, Amicus Curiae.

Paul D. Kamenar, Daniel J. Popeo, Washington Legal Foundation, Washington, DC, Evan Slavitt, Lisa Tucker McElroy, Gadsby & Hannah, Boston, MA, for Washington Legal Foundation, Amicus Curiae.

Donald Baxter Craven, Washington, DC, Alan I. Horowitz, Clarence T. Kipps, Miller & Chevalier Chartered, Robin S. Conrad, David Thomas Deal, Washington, DC, for Chamber of Commerce of the United States of America and American Petroleum Institute, Amicus Curiae.

Jim M. Perdue, Sr., Jim Mac Perdue, Jr. (argued), Houston, TX, for Riley.

Douglas N. Letter (argued), U.S. Dept. of Justice, Civ. Div., App. Staff, Washington, DC, for Intervenor.

L. Boyd Smith, Jr., Michael Warren Mengis, Kathryn Lynn Hays, Gary W. Eiland, Vinson & Elkins, Houston, TX, for St. Luke's Hosp., Branislav Radovancevic and Texas Heart Institute.

Solace Kirkland Southwick, Raina Spielman Newsome, Jeffrey B. McClure, Mayor, Day, Caldwell & Keeton, Houston, TX,

Stephen P. Murphy, Reed, Smith, Shaw & McClay, Washington, DC, for American Health Care Ass'n (AHCA), Amicus Curiae.

Ray M. Aragon, C. Stanley Dees, McKenna & Cuneo, Washington, DC, Herbert L. Fenster, McKenna & Cuneo, Denver, CO, Barbara Jean Bacon, McKenna & Cuneo, Los Angeles, CA, Gregory Thomas Jaeger, McKenna & Cuneo, Arlington, VA, for Aerospace Industries Ass'n of America, American Hosp. Ass'n, Electronic Industries Alliance, Nat. Defense Industrial Ass'n, and Professional Services Council, Amicus Curiae.

Jack R. Bierig, Sidley & Austin, Chicago, IL, Andrew E. Weis, Sidley & Austin, Washington, DC, for American Medical Ass'n and The Ass'n of American Medical Colleges, Amicus Curiae.

Before SMITH, DeMOSS and STEWART, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Joyce Riley appeals the dismissal, for want of jurisdiction, of her action for damages under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* While we conclude, based on intervening circuit caselaw, that the district court did have jurisdiction, we also determine that Riley may not maintain her suit, for the provisions of the FCA under which she sued violate the Take Care Clause of Article II of the Constitution. Accordingly, we affirm the dismissal.*

---

* In accordance with Court policy, this opinion, being one which initiates a conflict with the rule declared in another circuit, was circulated before release to the entire Court, and rehearing en banc was voted by a majority of the non-recused judges in active service. In accordance with 5TH CIR. R. 41.3 the panel opinion is vacated and the mandate held pending en banc consideration.

1. Specifically, Riley alleges that defendants (1) unnecessarily admitted patients to the hos-

## I.

Riley, a former nurse in the heart transplant unit of St. Luke's Episcopal Hospital ("St. Luke's"), sued eight defendants: St. Luke's, Baylor College of Medicine, the University of Texas Health Science Center at Houston, the Texas Heart Institute, Surgical Associates of Texas, Doctors Edward Massin and O. Howard Frazier, and Branislav Radovancevic. Riley alleges that these defendants violated the FCA by defrauding and conspiring to defraud the United States Treasury.[1]

Riley brought her suit under the *qui tam* provisions of the FCA, which allow individual citizens to sue for fraud on behalf of the government and collect part of the government's recovery. Pursuant to the procedures established in the *qui tam* provisions, *see* 31 U.S.C. § 3730(b)(2), Riley filed a preliminary statement under seal, which the United States reviewed at length. The government eventually decided not to intervene under 31 U.S.C. § 3730(b)(4)(B), so Riley proceeded in the district court on her own.

After Riley filed her original complaint, the defendants moved to dismiss under FED.R.CIV.P. 12(b)(6) for failure to state a claim. The district court denied each motion but requested additional briefing to address Riley's standing under Article III of the United States Constitution. Riley, the University of Texas Health Science Center at Houston, and the United States as intervenor for the limited purpose of defending the FCA's constitutionality, briefed the standing issue. Riley then filed a second amended complaint, which was met with another round of motions to

pital; (2) unnecessarily upgraded patients' services (*e.g.,* needlessly transferred them into intensive care); and (3) allowed Radovancevic, an unlicensed physician, to perform services and prescribe medicines and then accepted government money from Medicare and the Civilian Health and Medical Program of the Uniform Services for the services and prescriptions.

dismiss. Among the grounds for dismissal was an assertion by the University of Texas Health Science Center at Houston that the Eleventh Amendment bars Riley from suing it, because it is an arm of the state. *See* U.S. Const. amend. XI.

In a scholarly and persuasive opinion, the district court dismissed Riley's claims on jurisdictional grounds, concluding that she had suffered no injury-in-fact and therefore lacked standing to sue. *See US. ex rel. Riley v. St. Luke's Episcopal Hosp.,* 982 F.Supp. 1261, 1263–69 (S.D.Tex.1997) (Hoyt, J.). Because the court dismissed on standing grounds, it did not reach the arguments presented in the motions to dismiss, including the Eleventh Amendment defense.

On appeal, the defendants maintain that Riley lacks standing, and they assert two other constitutional arguments that they presented to the district court in their motions to dismiss: (1) that the *qui tam* provisions of the FCA violate the Constitution's Appointments Clause and (2) that *qui tam* actions in which the government does not intervene violate the Take Care Clause and the constitutional doctrine of separation of powers. The United States continues its intervention for the limited purpose of defending the constitutionality of the *qui tam* provisions.

## II.

Congress enacted the FCA in 1863 to combat widespread fraud by government contractors during the Civil War.[2] The Act, which was amended in 1943 and 1986, provides that anyone who presents a false money claim to the federal government shall be liable for double or treble damages and civil penalties of up to $10,000 per false claim. *See* 31 U.S.C. § 3729. Under the *qui tam* provisions of the Act, any person may bring a civil action "for the person and for the United States Government" to recover damages and penalties.[3] *See id.* § 3730(b)(1). Though initiated by a private person—a "relator"—a *qui tam* action is "brought in the name of the Government." *See id.*

The *qui tam* provisions indicate that the United States is the real party in interest, with the relator functioning as the government's attorney. To initiate a *qui tam* action, a relator must serve on the government the complaint and a written disclosure of the information he possesses. *See id.* § 3730(b)(2). The Attorney General then must decide, within sixty days, whether to "intervene and proceed with the action."[4] *See id.* By the expiration of the sixty days, the Attorney General must inform the court whether the government shall proceed with the action; if not, "the person bringing the action shall have the right to conduct the action." *See id.* § 3730(b)(4)(B).

If the Attorney General declines to proceed, the relator alone represents the United States, taking full control of the litigation, including discovery, admissions, and presentation of evidence, subject only to a few specific limitations.[5] If the rela-

---

**2.** The district court provided an excellent summary of the workings of the *qui tam* provisions of the FCA. *See Riley,* 982 F.Supp. at 1263.

**3.** The term *"qui tam,"* which has been in use for centuries, is short for *"qui tam pro domino rege quam pro se imposo sequitur,"* which means "who brings the action as well for the king as for himself." *See Bass Anglers Sportsman's Soc'y of Am. v. U.S. Plywood–Champion Papers, Inc.,* 324 F.Supp. 302, 305 (S.D.Tex. 1971).

**4.** The government may, "for good cause shown," move the court for an extension of the 60-day examination period. *See* 31 U.S.C. § 3730(b)(3).

**5.** A *qui tam* action may be dismissed only if the court and the Attorney General give written consent. *See* 31 U.S.C. § 3730(b)(1); *Searcy v. Philips Electronics N. Am. Corp.,* 117 F.3d 154, 159 (5th Cir.1997) (holding that voluntary dismissal requires government consent even if the government does not intervene). If the government shows that discovery by the relator would interfere with ongoing civil or criminal investigations or prosecutions, the court may stay discovery for a period not to exceed 60 days. *See* 31

tor prevails, most of the recovery is paid into the Treasury, with the relator keeping between 25% and 30% as his reward. *See id.* § 3730(d)(2). The relator is also entitled to attorneys' fees. *See id.*

If the Attorney General initially decides not to proceed, he may intervene later only upon a showing of "good cause," and such intervention may not limit "the status and rights of the person initiating the action." *See id.* § 3730(c)(3). The relator thus retains primary control over the case, despite the government's intervention.

If the Attorney General does enter the action within the initial sixty-day period, the government has "primary responsibility for prosecuting the action." *See id.* § 3730(c)(1). The relator, however, retains "the right to continue as a party to the action." *See id.* This participation right gives him a substantial role in the litigation, and he is entitled to a hearing if the Attorney General decides to dismiss the action. *See id.* § 3730(c)(2)(A).

If the Attorney General proposes to settle the case but the relator objects, the settlement may proceed only if "the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances." *See id.* § 3730(c)(2)(B). In addition, the relator participates fully at trial, calling and cross-examining witnesses, except that

> [u]pon a showing by the Government that unrestricted participation during the course of the litigation by the person initiating the litigation would interfere

U.S.C. § 3730(c)(4). The court may impose further stays if the Attorney General shows "that the Government has pursued the criminal or civil investigation or proceedings with reasonable diligence and any proposed discovery in the [*qui tam*] action will interfere with the ongoing criminal or civil investigation or proceedings." *See id.*

6. *See Marvin v. Trout,* 199 U.S. 212, 225, 26 S.Ct. 31, 50 L.Ed. 157 (1905) ("Statutes providing for actions by a common informer, who himself had no interest in the controversy other than that given by the statute, have been in existence for hundreds of years in

with or unduly delay the Government's prosecution of the case, or would be repetitious, irrelevant, or for the purposes of harassment, the court may, in its discretion, impose limitations on the person's participation.

*See id.* § 3730(c)(2)(C).

When the False Claims action is primarily conducted by the Attorney General, the relator receives between 15% and 25% of the proceeds, plus reasonable expenses (including attorneys' fees), as determined by the court. *See id.* § 3730(d)(1). Moreover, if the government decides to pursue its claim in some forum other than an FCA suit—such as an administrative penalty action—the relator has the same rights in that proceeding that he would have in court. *See id.* § 3730(c)(5).

### III.

Riley and the government contend that the long history of *qui tam* actions in federal courts indicates that such actions surely are constitutionally valid. But the *qui tam* mechanism's historical pedigree is not sufficient to insulate the FCA's *qui tam* provisions from serious constitutional scrutiny.

Riley and the government correctly point out that *qui tam* actions have been recognized throughout American history and were approved under English common law prior to the founding of the Republic.[6] They also note that the first Congress enacted several statutes containing *qui tam* provisions,[7] a fact they believe indi-

England, and in this country since the foundations of the Government.").

7. See Act of March 1, 1790, ch. 2, § 3, 1 Stat. 101, 102 (providing for *qui tam* actions against Marshals who fail to file census returns); Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. 131, 133 (actions against masters who fail to execute shipping agreements with seamen and against persons harboring runaway seamen); Act of July 22, 1790, ch. 33, § 3, 1 Stat. 137, 137–38 (actions against persons engaging in unlicensed trade with Indians). Other statutes passed by the First Congress entitled an "informer" to share with the gov-

cates that the framers did not think the *qui tam* concept is inconsistent with the Constitution.[8]

■ Longstanding historical usage, however, does not, by itself, render a practice constitutional.[9] When the Supreme Court has deferred to history to validate the constitutionality of a practice, the practice has been one that was extensively debated by the adopting Congress and had become "part of the fabric of our society."[10]

*Qui tam* actions that are brought by uninjured relators and in which the government does not intervene simply do not possess historical credentials worthy of blind deference. There is no evidence that

the early Congresses considered the constitutionality of such actions, and the presence of a few early *qui tam* statutes does not amount to an "unambiguous and unbroken history." Indeed, such statutes were adopted in the Republic's early years only sparsely, and they largely disappeared over a century ago.

Many of the early statutes granting bounties were simply informer laws that granted informers a reward but no right to sue on behalf of the government.[11] Of those *qui tam* statutes that did permit private actions, most redressed injuries suffered by private individuals—not by the government exclusively.[12] Later Con-

---

ernment any monetary penalties recovered under the act, but did not make plain whether the informer was himself entitled to sue. *See* Act of July 1, 1789, ch. 5, § 29, 1 Stat. 29, 45 (customs duties); Act of September 1, 1789, ch. 11, § 21, 1 Stat. 55, 60 (registration of vessels); Act of August 4, 1790, ch. 35, § 55, 1 Stat. 145, 173 (import and tonnage duties).

**8.** Riley also notes that the first Congress provided for federal courts to hear "prize cases," which, she asserts, are analogous to *qui tam* actions. Under the prize statutes, a privater could bring a captured vessel into the jurisdiction of the United States and file an *in rem* action. If the vessel was condemned, the captor was entitled to the ship or its value. *See, e.g., The Sally*, 12 U.S. (8 Cranch) 382, 3 L.Ed. 597 (1814); *The Nassau*, 71 U.S. (4 Wall.) 634, 18 L.Ed. 413 (1866). The prize cases are inapposite, however, for the prize statutes empowered the President to commission privater, who then acted as authorized agents of the Executive and collected captured vessels as compensation for their services. *See The Sally*, 12 U.S. (8 Cranch) at 384 ("[T]he prize act ... operates as a grant from the United States of all property rightfully captured by commissioned privater, as prize of war."). Relators, by contrast, are not commissioned by the Executive to act as government agents.

**9.** *See Marsh v. Chambers*, 463 U.S. 783, 790, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) ("Standing alone, historical practice cannot justify contemporary violations [of the Constitution.]"); *Walz v. Tax Commission*, 397 U.S. 664, 678, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) ("It is obviously correct that no one acquires a vested or protected right in viola-

tion of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it.").

**10.** *See Marsh*, 463 U.S. at 792, 103 S.Ct. 3330. For example, in holding that appointing paid chaplains to open legislative proceedings does not violate the Establishment Clause, the *Marsh* Court reviewed the Framers' extensive debates regarding the practice's constitutionality and drew a distinction between actions carefully considered by the Framers and those "taken thoughtlessly, by force of long tradition and without regard to the [constitutional] problems." *Id.* at 791, 103 S.Ct. 3330. The Court also noted that "the unambiguous and unbroken history of more than 200 years" indicated that the practice "ha[d] become part of the fabric of our society." *Id.* at 792, 103 S.Ct. 3330.

**11.** Five of the *qui tam* provisions enacted by the First Congress fit this model. *See* Act of July 31, 1789, ch. 5, § 38, 1 Stat. 29, 48; Act of Sept. 1, 1789, ch. 11, § 21, 1 Stat. 55, 60; Act of Aug. 4, 1790, § 69, 1 Stat. 145, 177 (customs and maritime laws providing for a share of recovery to informers); Act of Sept. 2, 1789, ch. 13, § 8, 1 Stat. 65, 67 (penalties levied against Treasury Department officials for violation of prohibitions attached to their office); Act of March 3, 1791, ch. 8, § 1, 1 Stat. 215 (same). Two other statutes authorized government appointed census-takers to bring suits against uncooperative citizens and to retain half of any fines recovered. *See* Act of March 1, 1790, ch. 2, § 6, 1 Stat. 101, 103; Act of July 5, 1790, ch. 25, § 1, 1 Stat. 129.

**12.** *See* Act of July 31, 1789, ch. 5, § 29, 1 Stat. 29, 45 (permitting recovery against cus-

gresses authorized *qui tam* actions only sporadically; apart from the FCA, subsequent Congresses enacted only seven *qui tam* statutes, and none was adopted after 1871.[13] In short, this is no "unambiguous and unbroken history" indicating that *qui tam* actions by uninjured plaintiffs suing on the government's behalf "have become part of the fabric of our society." *See Marsh*, 463 U.S. at 792, 103 S.Ct. 3330.

In addition, the fact that the First Congress adopted some form of *qui tam* does not necessarily mean that *qui tam* actions are constitutional. Indeed, in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), the Court struck down as unconstitutional § 13 of the Judiciary Act, adopted by the First Congress, and the Supreme Court has subsequently opined that numerous other actions taken by the First Congress were unconstitutional.[14]

The notion that a Congress whose members were involved in the adoption of a constitutional provision are the definitive expounders of the provision's meaning is suspect. For example, the same Congress that proposed the Fourteenth Amendment adopted *one week later* a statute that reaffirmed racial segregation of public schools in Washington, D.C. *See Marsh*, 463 U.S. at 814 n. 30, 103 S.Ct. 3330 (Brennan, J., dissenting). Accordingly, we decline simply to defer to history to resolve the constitutional questions presented.

## IV.

■ The district court held that it lacked power to adjudicate Riley's claim under Article III, which limits the federal judiciary's power to resolving "cases" or

---

toms officials who failed to display a table of fees and duties); Act of Aug. 4, 1790, ch. 35, § 55, 1 Stat. 145, 173 (same); Act of July 20, 1790, ch. 29, § 1, 1 Stat. 131 (allowing recovery against ships' masters who failed to contract with crew); *id.* § 4, 1 Stat. 131, 133 (permitting recovery against persons harboring runaway seamen). Two other statutory provisions permitted only injured parties to sue. *See* Act of May 31, 1790, ch. 15, §§ 2, 6, 1 Stat. 124, 125–26 (allowing authors and publishers to recover from copyright violators).

**13.** Those statutes were (1) Act of Feb. 20, 1792, ch. 7, § 25, 1 Stat. 232, 239 (providing that informer could sue for penalties under postal statute and keep half); reenacted Mar. 3, 1845, ch. 43, § 17, 5 Stat. 732, 738; (2) Act of Mar. 22, 1794, ch. 11, §§ 2, 4, 1 Stat. 347, 349 (providing that individual could prosecute on government's behalf for slave trading); reenacted by Act of Mar. 26, 1804, ch. 38, § 10, 2 Stat. 283, 286; Act of Mar. 2, 1807, ch. 22, § 3, 2 Stat. 426; Act of Mar. 4, 1909, ch. 321, §§ 254–57, 35 Stat. 1138, 1140; (3) Act of July 6, 1797, ch. 11, § 20, 1 Stat. 527, 532 (providing that informer received half of penalties related to duties on paper products—unclear whether informer could sue); adopted by Act of Feb. 28, 1799, ch. 17, § 5, 1 Stat. 622, 623 (same for penalties involving altering stamp duties); (4) Act of May 3, 1802, ch. 48, § 4, 2 Stat. 189, 191 (providing that individual could prosecute on government's behalf for employment of other

than a "free white person" in postal service); (5) Act of Aug. 5, 1861, ch. 45, § 11, 12 Stat. 292, 296–97 (providing that individual could sue import assessor acting without taking oath, and keep half the fine); (6) Act of July 8, 1870, ch. 230, § 39, 16 Stat. 198, 203 (providing that individual could sue on government's behalf for unlawful contracting with Indians); reenacted by Act of May 21, 1872, ch. 177, § 3, 17 Stat. 136, 137. The First Congress's statute regarding unlawful trading with Indians was also reenacted. Act of Mar. 1, 1793, ch. 19, § 12, 1 Stat. 329, 331; Act of May 19, 1796, ch. 30, § 18, 1 Stat. 469, 474; Act of Mar. 30, 1802, ch. 13, § 18, 2 Stat. 139, 145; Act of June 30, 1834, ch. 161, § 27, 4 Stat. 729, 733–34.

**14.** *See, e.g., Wallace v. Jaffree*, 472 U.S. 38, 100, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting) (federal aid to sectarian schools unconstitutional despite grants of such aid by the first Congress); *Marsh*, 463 U.S. at 814 n. 30, 103 S.Ct. 3330 (1983) (Brennan, J., dissenting) (First Congress's statute requiring public whipping of thieves presumably unconstitutional today); *INS v. Chadha*, 462 U.S. 919, 982 n. 18, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (holding that use by First Congress of precursors to the legislative veto was unconstitutional); *Hayburn's Case*, 2 U.S. (2 Dall.) 408, 1 L.Ed. 436 (1792) (declining to enforce First Congress's statute giving courts non-judicial duties). *Cf. New York Times Co. v. Sullivan*, 376 U.S. 254, 276, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ("broad

"controversies." *See* U.S. CONST. art. III, § 2. The court determined that Riley lacked standing under Article III because she had not alleged all the elements of standing required by recent Supreme Court decisions; in particular, she lacked an injury-in-fact. *See Riley*, 982 F.Supp. at 1268.

On appeal, the defendants present a number of arguments in support of the district court's conclusion that a *qui tam* relator who has not experienced any personalized injury fails the test for Article III standing set forth in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).[15] We are precluded, however, from addressing those contentions, for a panel of this court recently concluded that a *qui tam* relator who has suffered no personalized injury may have standing even if the government does not intervene. *See United States ex rel. Foulds v. Texas Tech Univ.*, 171 F.3d 279, 288 n. 12 (5th Cir.1999), *petition for cert. filed*, 68 U.S.L.W. 3138 (U.S. Aug. 23, 1999) (No. 99–321), *petition for cert. filed*, 68 U.S.L.W. 3153 (U.S. Aug. 27, 1999) (No. 99–365), *petition for cert. filed* (Aug. 27, 1999) (No. 99–513).[16]

In what amounts to no more than a passing reference in a brief footnote, the *Foulds* panel, in stating that an uninjured *qui tam* relator may have standing, relied on two authorities: a pre-*Defenders of Wildlife* opinion of this court concluding that an uninjured relator had standing, *see United States ex rel. Weinberger v. Equifax*, 557 F.2d 456, 460 (5th Cir.1977), and a recent opinion in which the Supreme Court adjudicated an FCA *qui tam* suit without objecting to the standing of the uninjured relator, *see Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). Defendants argue that neither of these authorities is controlling.

*Weinberger*, issued before the Supreme Court strengthened the standing doctrine, adopted a now-repudiated "statutory permission" theory, which reasons that uninjured relators have standing because Congress has granted it to them via statute.[17] That theory, adopted by some other courts that have approved relator standing,[18] was viable when there was some confusion as to whether injury-in-fact is a prudential standing requirement that is waivable.[19] But the Supreme Court since has indicated that the injury requirement is a constitutional—not a prudential—standing requirement and, accordingly, cannot be waived by legislation.[20]

---

consensus" that Sedition Act of 1789 was unconstitutional).

**15.** The defendants argue that the weight of authority holding that uninjured *qui tam* relators may have standing, *see United States ex rel. Berge v. Board of Trustees*, 104 F.3d 1453, 1457–58 (4th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 301, 139 L.Ed.2d 232 (1997); *United States ex rel. Killingsworth v. Northrop Corp.*, 25 F.3d 715, 720 (9th Cir.1994); *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1154 (2d Cir. 1993); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir.1993); *United States ex rel. Woodard v. Country View Care Ctr.*, 797 F.2d 888, 893 (10th Cir.1986); *United States ex rel. Weinberger v. Equifax*, 557 F.2d 456, 460 (5th Cir.1977), is unpersuasive, for each court that has approved a relator's standing under the FCA has relied on fallacious reasoning or on standing theories that are invalid in light of the subsequent decision in *Defenders of Wildlife*.

**16.** The district court did not have the benefit of *Foulds*, which was issued after judgment was entered herein.

**17.** *See Weinberger*, 557 F.2d at 460 (reasoning that "the statute clearly accords [the relator] standing to bring the action").

**18.** *See, e.g., Woodard*, 797 F.2d at 893 ("The statute of course eliminated any standing problem.").

**19.** *See Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (referring to prudential standing requirements that are waivable by statute).

**20.** *See Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130 (holding that the injury requirement is part of the "irreducible constitutional minimum of standing"); *Raines v. Byrd*, 521 U.S. 811, 820 n. 3, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) ("It is settled that Congress cannot erase Article III's standing

The *Hughes Aircraft* Court's failure to object to a lack of standing also does not compel the conclusion that *qui tam* relators meet Article III's standing requirements. The Court's failure to address standing should not necessarily be read as an implicit holding that standing exists,[21] for in dismissing the relator's action on statutory grounds, the Court may simply have been taking the "prudential" route of avoiding constitutional questions.[22] Notably, *Hughes Aircraft* was decided before *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), which rejected that prudential approach for jurisdictional questions.

■ Nonetheless, the panel that decided *Foulds*—albeit *sua sponte* and without benefit of briefing—did raise the issue of relator standing, concluding that a *qui tam* relator who lacked a personalized injury had standing, even when the government had declined to intervene. Our "rule of orderliness" therefore binds us on this issue, as a panel of this court cannot overrule a prior panel, absent circumstances not present here. *See Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423, 425–26 (5th Cir.1987).[23]

Defendants contend that *Foulds*'s discussion of relator standing is *dictum* and thus is not binding on us. They note that the *Foulds* court did not need to reach the issue of the relator's standing to resolve the question presented in that case—*i.e.*, whether the Eleventh Amendment barred the relator's claims against state entities— for the Eleventh Amendment issue was itself jurisdictional. *See Foulds*, 171 F.3d at 288 (characterizing whether the Eleventh Amendment applies as a "threshold jurisdictional issue"). Hence, *Foulds*'s holding that the Eleventh Amendment barred the *qui tam* relator's suit against state entities disposed of all claims in that case, regardless of whether the relator individually possessed Article III standing. Defendants therefore urge that *Foulds*'s discussion of a *qui tam* relator's standing does not control the Article III issue presented in this appeal.

We disagree that *Foulds* is not controlling. In concluding that *Foulds*'s discussion of the relator's standing is unnecessary to the opinion's ultimate conclusion and is therefore *dictum*, the defendants assume that the jurisdictional requirements of Article III and the Eleventh Amendment are "at the same level." In other words, it is not necessary, they assume, to determine whether there is an Article III case or controversy before deciding whether the Eleventh Amendment limits the federal court's power to hear the case.

The Supreme Court has concluded otherwise. In *Calderon v. Ashmus*, 523 U.S. 740, 745, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998), the Court determined that it "must first address" whether a particular action for a declaratory judgment was an Article III case or controversy before deciding the Eleventh Amendment question on which certiorari had been granted. The *Calderon* Court explained that "[w]hile the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power, and therefore can be raised at any stage of the proceedings, we have recognized that it is not coextensive with the limitations on judicial power

requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.").

**21.** *See Giles v. NYLCare Health Plans, Inc.*, 172 F.3d 332, 338 n. 12 (5th Cir.1999) ("Even though subject matter jurisdiction can be raised *sua sponte*, we take nothing away from our failure to do so in these cases.").

**22.** *See, e.g., Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

**23.** Despite the fact that *Foulds* has decided the issue, we have discussed the question, for the benefit of the reader, because the *Foulds* court engaged in no analysis of the standing question.

in Article III."[24]

Hence, while the *Foulds* court was correct to characterize whether the Eleventh Amendment applies as a "threshold jurisdictional issue," *see Foulds*, 171 F.3d at 288, defendants are wrong in assuming that Article III standing—a more "basic" jurisdictional requirement—need not be addressed before considering whether the Eleventh Amendment abrogates federal jurisdiction. *Foulds*'s discussion of standing, then, is not *dictum* and binds this panel to the conclusion that an uninjured *qui tam* relator may have Article III standing.

## V.

The defendants moved to dismiss, *inter alia*, on the ground that *qui tam* actions that are brought by uninjured relators such as Riley and in which the government does not intervene violate the Constitution's Take Care Clause and the constitutional doctrine of separation of powers. Although the district court dismissed only on the basis of lack of standing, the defendants' alternative constitutional arguments are properly before us on appeal[25] and

provide an alternative ground for affirming the dismissal.[26]

## A.

The Take Care Clause states that "[the Executive] shall take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. The doctrine of separation of powers prohibits one branch of government from intruding on the constitutionally granted powers of another.[27] The doctrine may be violated when one branch of government aggrandizes itself at the expense of another *or* when one branch "impermissibly undermine[s]" the constitutionally granted powers and functions of another, even if there is no aggrandizement.[28]

Defendants contend that Congress' enactment of *qui tam* provisions that permit relators to bring actions on behalf of the government, even when the government declines to intervene, violated separation of powers and the Take Care Clause, because Congress transferred power to prosecute the government's claims from the Executive Branch to unaccountable private relators. Defendants maintain that (1)

24. *Id.* at 745 n. 2, 118 S.Ct. 1694 (citing *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 267, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); *Patsy v. Board of Regents*, 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982)).

25. *See Colautti v. Franklin*, 439 U.S. 379, 397 n. 16, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) ("Appellees, as the prevailing parties, may of course assert any ground in support of that judgment, 'whether or not that ground was relied upon or even considered by the trial court.'") (quoting *Dandridge v. Williams*, 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)).

26. *Wooton v. Pumpkin Air, Inc.*, 869 F.2d 848, 850 n. 1 (5th Cir.1989) ("When the judgment of the district court is correct, it may be affirmed on appeal for reasons other than those asserted or relied on below.") (quoting *Terrell v. University of Tex. Sys. Police*, 792 F.2d 1360, 1362 n. 3 (5th Cir.1986)).

27. *See Humphrey's Executor v. United States*, 295 U.S. 602, 629–30, 55 S.Ct. 869, 79 L.Ed.

1611 (1935) ("The fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others ... is hardly open to serious question.").

28. *See Clinton v. Jones*, 520 U.S. 681, 701, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) (stating that "the separation of powers doctrine requires that a branch not impair another in the performance of its constitutional duties") (quoting *Loving v. United States*, 517 U.S. 748, 757, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996)); *Morrison v. Olson*, 487 U.S. 654, 694–95, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 856–57, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986); *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 443, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). *See also* Neil Kinkopf, *Of Devolution, Privatization and Globalization: Separation of Powers Limits on Congressional Authority To Assign Federal Power to Non-federal Actors*, 50 RUTGERS L.REV. 331, 338–39 (1998).

prosecution of the government's claims by individuals wholly outside the Executive Branch constitutes a violation of the Take Care Clause, and (2) the fact that the Legislative Branch stripped the Executive Branch of its exclusive prosecution power constitutes a violation of the separation of powers doctrine.[29] We consider these arguments together, because they are closely intertwined: Each is concerned with the encroachment on the Executive's exclusive power to conduct litigation on behalf of the United States.

### B.

■ The Take Care Clause gives the Executive the power to enforce the laws, *see Springer v. Philippine Islands,* 277 U.S. 189, 202, 48 S.Ct. 480, 72 L.Ed. 845 (1928), and such power includes the authority "to investigate and litigate offenses against the United States," *see United States ex rel. Stillwell v. Hughes Helicopters, Inc.,* 714 F.Supp. 1084, 1088 (C.D.Cal. 1989) (citing *Buckley v. Valeo,* 424 U.S. 1, 138, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)). There are relatively few cases in which the Supreme Court has discussed the Executive Branch's "take care" duties and the separation of powers problems that are raised when an act of Congress impinges on those duties. In *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 856, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986), the Court stated that an act of Congress is unconstitutional if it "impermissibly undermines" the powers of the Executive—leaving unanswered the definition of "permissible." In *Nixon v. Administrator of Gen.*

*Servs.,* 433 U.S. 425, 443, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the Court held that Congress may not disrupt "the proper balance between the coordinate branches [by] prevent[ing] the Executive from accomplishing its constitutionally assigned functions"; the Court did not explain what degree of congressional interference is necessary before the "proper balance" has been disrupted.

In a more recent case, the Court suggested that vesting federal law enforcement authority in officials who are not under the meaningful control of the President violates the Take Care Clause. Striking down (on other grounds) Brady Act provisions that required state officials to execute federal law by conducting background checks on gun purchasers, the Court explained:

> The Constitution does not leave to speculation who is to administer the laws enacted by Congress; the President, it says, "shall take Care that the Laws be faithfully executed," Art. II, § 3, personally and through officers whom he appoints.... The Brady Act effectively transfers this responsibility to thousands of [state law enforcement officers] in the 50 States, who are left to implement the program without meaningful Presidential control (if indeed meaningful Presidential control is possible without the power to appoint and remove). The insistence of the Framers upon unity in the Federal Executive—to insure both vigor and accountability—is well-known.... That unity would be shattered, and the power of the President

29. The dissent insists that there is no separation of powers problem, because "Congress has not usurped [executive authority] at all, much less for its own use." In so reasoning, the dissent commits the error of viewing all separation of powers violations as requiring *aggrandizement* of one branch at the expense of another.

The separation of powers doctrine is not so limited; it may also be violated when one branch "impermissibly undermine[s]" the constitutionally assigned powers of another, even if the trespassing branch does not usurp those powers for itself. *See, e.g., Jones,* 520

U.S. at 701, 117 S.Ct. 1636 ("[T]he separation of powers doctrine requires that a branch not impair another in the performance of its constitutional duties.") (quoting *Loving,* 517 U.S. at 757, 116 S.Ct. 1737). Defendants' argument is that Congress, in stripping the Executive of his exclusive power to initiate and control causes of action that belong exclusively to the government, impermissibly undermined the President's power to "take Care that the Laws be faithfully executed." Defendants do not attempt to show that Congress aggrandized itself, but they need not do so to establish a separation of powers violation.

would be subject to reduction, if Congress could act as effectively without the President as with him, by simply requiring state officers to execute its laws. *Printz v. United States*, 521 U.S. 898, 936, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (citations omitted).[30]

The Court's most thorough analysis of the Take Care Clause and its relationship to the separation of powers doctrine appears in *Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), in which the Court upheld the constitutionality of the independent counsel provisions of the Ethics in Government Act. The Court announced that when congressional action potentially undermines the Executive's litigative function, the test of constitutionality is whether the Executive Branch retains sufficient "control" over the litigation "to ensure that the President is able to perform his constitutionally assigned duties." *Id.* at 696, 108 S.Ct. 2597. While this test is not much more instructive than are the formulations in *Schor* and *Nixon* and the

dicta in *Printz*, it is the Court's most direct pronouncement on this category of separation of powers problems, and the courts that have considered the constitutionality of the FCA's *qui tam* provisions agree that the *Morrison* "control" test is the appropriate standard to apply in addressing the Take Care Clause/separation of powers issue.[31]

## C.

We therefore use *Morrison* as our guide. To determine whether the *qui tam* provisions violate the Take Care Clause and the separation of powers doctrine, we first consider the extent to which the provisions reduce the Executive's control of litigation on the government's behalf, and we then compare that loss of control to the degree of loss the *Morrison* Court found to be constitutionally acceptable.[32]

### 1.

*FCA qui tam* actions in which the government does not intervene encroach on

**30.** The *Printz* Court observed that early statutes requiring state officials to enforce federal laws imposed only adjudicative, not executive, duties on state officials. *See Printz,* 521 U.S. at 927, 117 S.Ct. 2365 (recognizing "early [federal] statutes imposing obligations on state courts" but noting an "utter lack of statutes imposing obligations on the States' executives"). This observation counters the government's argument that the history of state officials' executing federal law demonstrates that the Constitution does not require that the President retain meaningful control over federal law enforcement. The early statutes to which the government points as indicating that state officials have historically enforced federal law may have permitted adjudicative tasks, but they could not properly have allowed state officials to sue on behalf of the federal government, for "[a] lawsuit is the ultimate remedy for a breach of the law, and it is to the President ... that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.' " *Buckley v. Valeo,* 424 U.S. 1, 138, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam).

**31.** *See, e.g., Kelly,* 9 F.3d at 750–51; *United States ex rel. Truong v. Northrop Corp.,* 728 F.Supp. 615, 620–22 (C.D.Cal.1989) (reasoning that "under *Morrison v. Olson,* for the qui

tam provisions of the False Claims Act to pass constitutional muster, the executive branch must retain 'sufficient' ... control over the litigation"); *Stillwell,* 714 F.Supp. at 1089–90; *United States ex rel. Newsham v. Lockheed Missiles & Space Co.,* 722 F.Supp. 607, 611–13 (N.D.Cal.1989).

**32.** The independent counsel provisions of the EGA likely represent the outer limits of congressional encroachment on another branch's powers and functions. As discussed below, the provisions were narrowly tailored to address a particularly perplexing intra-branch conflict: the conflict of interest that exists when the Attorney General is called on to investigate criminal wrongdoing by his close colleagues within the Executive Branch.

The Supreme Court accepted the independent counsel device's encroachment on executive powers as an evil that had to be incurred to provide some accountability within the Executive Branch. The problem presented was unique, and the Court was thus particularly forgiving of executive encroachment. We therefore view *Morrison* as expressing the outer boundary of executive encroachment; any legislation that leads to more encroachment than that the *Morrison* Court considered must be unconstitutional.

two aspects of the Executive's authority: (1) the discretion to decide whether to prosecute a claim and (2) the control of litigation brought to protect the government's interests. First, the provisions permit a private citizen to sue on behalf of the government, even though the Attorney General—perhaps because he believes that institution of the action is inimical to the government's interests—has decided not to pursue the claim.[33] This power removes from the Executive Branch the prosecutorial discretion that is at the heart of the President's power to execute the laws.[34]

Riley and the government maintain that the prosecutorial discretion given the Executive means simply that he cannot be compelled to pursue an enforcement action he believes to be unwarranted; his discretion does not include the power to bar others from filing lawsuits under statutory schemes that permit enforcement through both governmental and private actions. But Riley and the government are falsely analogizing *qui tam* actions to actions in which the plaintiff sues on his own behalf and incidentally benefits the government, as in an antitrust case.[35]

Private enforcement actions *by aggrieved individuals* are not subject to the Executive's prosecutorial discretion, but when the sole injury—the only ticket into court—belongs to the government, the Executive's prosecutorial discretion must include the power to decide whether to bring suit. Therefore, the FCA provisions permitting *qui tam* actions to proceed when the government has decided not to intervene do encroach on the Executive's authority to initiate litigation aimed solely at redressing the government's injuries.

Second, the FCA's *qui tam* provisions significantly limit the government's ability to control the litigation. The Executive may not freely dismiss a *qui tam* action; if the relator objects to the decision to dismiss, the government must notify the relator of the filing of the motion to dismiss, and the court must grant the relator a hearing before deciding whether to permit dismissal.[36] *See* 31 U.S.C. § 3730(c)(2)(A).

Moreover, the Executive may not freely settle a *qui tam* action; if the relator objects to the government's attempt to settle, the government must obtain court approval, and the court may approve only after it holds a hearing and finds that the

**33.** *See* 31 U.S.C. § 3730(c)(3) ("If the Government elects not to proceed with the action, the person who initiates the action shall have the right to conduct the action.").

**34.** *See United States v. Nixon*, 418 U.S. 683, 693, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"); *Heckler v. Chaney*, 470 U.S. 821, 832, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) ("[T]he decision of a prosecutor in the Executive Branch not to indict . . . has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.' ").

**35.** The dissent draws a similar false analogy between *qui tam* actions and title VII suits. It construes title VII suits by private plaintiffs as the private enforcement of federal law. This analogy fails, because a private title VII plaintiff sues to redress his own injury and only incidentally benefits the government. By

contrast, the *only* interest most *qui tam* relators vindicate is the government's. *Qui tam* actions, unlike title VII suits, aim to redress purely public injuries.

**36.** The requirement that the government obtain court permission to dismiss a *qui tam* suit raises serious questions regarding the balance of power between the Executive and Judicial Branches. *See United States v. Cox*, 342 F.2d 167, 171 (5th Cir.1965) (en banc) ("It follows, as an incident of the constitutional separation of powers, that the courts are not free to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions."); *In re Int'l Bus. Machs. Corp.*, 687 F.2d 591, 602 (2d Cir.1982) ("The district court's involvement in the executive branch's decision to abandon litigation might impinge upon the doctrine of separation of powers."). Such questions are not implicated in this case, however, because they involve potential interference with Executive prerogatives not by a relator, as here, but by the judiciary.

settlement is "fair, adequate, and reasonable under all the circumstances."[37] *See id.* § 3730(c)(2)(B). The Executive may not freely restrict the relator's participation in the *qui tam* action; the government must first show the court that the relator's unrestricted participation "would interfere with or unduly delay the Government's prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment." *See id.* § 3730(c)(2)(C). Finally, the Executive has no power to remove the relator from the litigation under any circumstances.[38]

### 2.

■ Having considered how the FCA's *qui tam* provisions encroach on Executive authority, we now compare that encroachment to the loss of executive authority occasioned by the independent counsel provisions at issue in *Morrison*. We conclude that, in FCA *qui tam* actions in which the government does not intervene, important safeguards that ensure the Attorney General's control of the independent counsel are lacking. FCA *qui tam* actions in which the government does not intervene thus fail to provide the Attorney General with "sufficient control over the [relator] to ensure that the President is able to perform his constitutionally assigned dut[y]" to take care that the laws be faithfully executed. *See Morrison,* 487

U.S. at 696, 108 S.Ct. 2597. Accordingly, the FCA provisions permitting *qui tam* actions to proceed when the government does not intervene impermissibly undermine the President's exercise of his constitutionally assigned duties and thereby violate the separation of powers doctrine.

In upholding the independent counsel provisions, the *Morrison* Court stressed four features of the Ethics in Government Act that preserved Executive control of prosecutions:

> Most importantly, [1] the Attorney General retains the *power to remove* the counsel for "good cause," a power that we have already concluded provides the Executive with substantial ability to ensure that the laws are "faithfully executed" by an independent counsel. [2] No independent counsel may be appointed without a specific request by the Attorney General, and *the Attorney General's decision not to request appointment if he finds "no reasonable grounds to believe that further investigation is warranted" is committed to his unreviewable discretion.* The Act thus gives the Executive a degree of *control over the power to initiate* an investigation by the independent counsel. [3] In addition, the *jurisdiction of the independent counsel is defined with reference to the facts submitted by the Attorney General,*

---

37. *Gravitt v. General Elec. Co.,* 680 F.Supp. 1162 (S.D.Ohio 1988), illustrates how the *qui tam* provisions encroach on the Executive's control of settlements. There, the court refused to accept the government's settlement, lecturing the Justice Department on the inadequacy of its investigation into the matter alleged in the relator's complaint. *See id.* at 1164. It turns out, however, that the fraud complained of resulted in a net undercharge to the government, and a few years later, the Justice Department succeeded in settling for the sum the *Gravitt* court initially rejected. *See Memorandum re: Constitutionality of the Qui Tam Provisions of the False Claims Act,* 13 U.S. Op. Off. Legal Counsel 207, 219.

38. *See* 31 U.S.C. § 3730(c)(1) (providing that if the government intervenes, the relator "shall have the right to continue as a party to the action, subject to the limitations set forth

in paragraph (2)," none of which permits removal); *id.* § 3730(c)(3) (providing that if government intervenes after initially deciding not to do so, it may not limit relator's status and rights). One commentator has pointed out that a plain reading of § 3730(c)(3) appears to bar the government from dismissing a case if it intervenes after initially declining to do so, for dismissal would certainly "limit[ ] the status and rights of the person initiating the action." *See* James T. Blanch, Note, *The Constitutionality of the False Claims Act's Qui Tam Provisions,* 16 HARV. J.L. & PUB. POLICY 701, 766 (1993). *But see Kelly,* 9 F.3d at 752 & n. 8 (reasoning that to preserve the FCA, the Act should be interpreted to give government similar degree of control over litigation as if it had intervened at litigation's inception).

and [4] once a counsel is appointed, the Act requires that the counsel *abide by Justice Department policy* unless it is not "possible" to do so.

*Morrison*, 487 U.S. at 696, 108 S.Ct. 2597 (emphasis added).

None of these features is present in the FCA's *qui tam* provisions. The Attorney General has no power to remove a relator, no matter how irresponsible the suit becomes. If he makes the proper showing to the court, the Attorney General may limit the relator's participation, *see* 31 U.S.C. § 3730(c)(2)(C), and may dismiss the action after the court has provided the relator with a hearing on the motion to dismiss, *see id.* § 3730(c)(2)(A), but may not simply remove the relator, *see id.* § 3730(c)(1), (3).

Perhaps more importantly, the second crucial feature present in the independent counsel statute is missing: The Attorney General loses all control over the decision whether to initiate the suit. Even if the Attorney General determines that there are "no reasonable grounds" for the fraud action, the relator may override that judgment and initiate a lawsuit. The action goes forward in the government's name, under total control of the self-interested and publicly unaccountable relator, even if the Attorney General has concluded that

proceeding with a lawsuit is not merited or is otherwise not in the United States's interests or is even contrary to those interests.[39]

The third and fourth features are also conspicuously absent. The Attorney General has no control over the breadth of a relator's suit. Indeed, a relator may make sweeping allegations that, while true, he is unable effectively to litigate. He thereby can bind the government, via *res judicata,* and prevent it from suing over those concerns at a later date when more information is available. Finally, the relator, unlike the independent counsel, need not adhere to the rules and policies of the Department of Justice.

In *Kelly,* the Ninth Circuit recognized these distinctions between the independent counsel statute and the FCA's *qui tam* provisions but held that a proper analysis would focus on the net effect of the provisions on the Executive's powers—not on the presence or absence of the particular features the *Morrison* Court had highlighted.[40] It then concluded that "[t]aken as a whole, ... the FCA affords the Executive Branch a degree of control over qui tam relators that is not distinguishable from the degree of control the *Morrison* Court found the Executive Branch exercises over independent counsels."[41] *Kelly,* 9 F.3d at 757.

---

**39.** As the *Foulds* panel noted, "the government does not expect that the relator will act first and foremost with the government's interests in mind." *Foulds,* 171 F.3d at 290. *Qui tam* relators "are motivated primarily by prospects of monetary reward rather than the public good." *Hughes Aircraft,* 520 U.S. at 949, 117 S.Ct. 1871.

Of course, this concern about encroachment on the Executive's prosecutorial discretion is present only in *qui tam* actions in which the government declines to intervene. When the Attorney General does intervene, the Executive is essentially initiating the action at the urging of an informer, and he thereby retains "a degree of control over the power to initiate" the action. Accordingly, our holding addresses only those FCA *qui tam* actions, such as Riley's, in which the government declines to participate. We express no opinion as to whether *qui tam* actions in

which the government intervenes violate the Take Care Clause or the separation of powers doctrine.

**40.** The *Kelly* court explained:

[The defendant] suggests that we should look at the precise means of executive control identified and found sufficient in *Morrison,* and then base our decision on the absence of those same means in the qui tam provisions. [The relator], on the other hand, suggests that we identify all possible means of executive control in the qui tam provisions, and then compare them in toto to the means of control identified in *Morrison.* We believe that, under *Morrison,* Kelly's approach is the correct one. *Kelly,* 9 F.3d at 752.

**41.** The Second and Sixth Circuits, as well, have rejected Take Care Clause and separa-

We disagree. Even taking the *qui tam* provisions "as a whole" and not focusing on any of the particular differences between the provisions and the independent counsel statute, *qui tam* effects a greater degree of encroachment on Executive prerogatives than does the Ethics in Government Act upheld in *Morrison*. The Ninth Circuit admitted that the "Attorney General['s] ... unreviewable discretion to request appointment of a counsel, and therefore to initiate litigation by a counsel," is an "unqualified control built into the independent counsel provisions," and that "[c]learly, the government has greater authority to prevent the initiation of prosecution by an independent counsel than by a qui tam relator." *Id.* at 754. Once suit has been filed, the controls the Executive Branch may exercise—most of which require court approval of some sort—are simply not sufficient to counterbalance this major encroachment on Executive power.

Another fundamental difference between the *qui tam* provisions and the independent counsel statute supports our conclusion. The independent counsel device was intended to address a narrow structural problem—the perceived conflict of interest when the Attorney General is called on to investigate criminal wrongdoing by his close colleagues within the Executive Branch. The *Morrison* Court accepted the independent counsel as an appropriate means of dealing with this intra-branch conflict. The device arguably does not unduly encroach on executive power, *because its very purpose is to investigate impermissible executive activity*. Moreover, it is narrowly tailored to achieve its purpose: It encroaches on the Executive only to the limited extent necessary to protect against a conflict of interest, while retaining executive control consistent with that objective.

The FCA's *qui tam* provisions, on the other hand, are not aimed at a structural defect within the Executive Branch (They simply aim to increase protections against fraud.) and are not narrowly tailored to achieve their ends.[42] Given the independent counsel statute's special objective and narrow tailoring, the *Morrison* Court likely was especially forgiving of Executive encroachment. *Morrison*, then, represents, as we have said, the outer boundary of constitutionally permissible encroachment on executive powers, and the FCA's *qui tam* provisions must fall under *Morrison*'s compelling balancing test.[43]

---

tion of powers challenges to the *qui tam* provisions on the basis of the FCA's preservation of executive authority. *See Kreindler & Kreindler*, 985 F.2d at 1155; *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir.1994).

**42.** There are many other ways in which Congress could increase fraud enforcement. For example, it could provide greater resources to the Attorney General or greater bounties to informers.

**43.** Because our holding prohibits only those · *qui tam* actions in which the government does not intervene, the dissent's statistics indicating the effectiveness of *all* FCA *qui tam* actions are inapposite. The dissent cites statistics showing that FCA *qui tam* actions have resulted in a "boon to the federal treasury," implicitly suggesting that such statistics should influence our opinion of the constitutionality of the *qui tam* action at issue in this case. While the alleged effectiveness of the FCA's *qui tam* provisions should not affect

our decision as to their constitutionality, we note that the only statistics relevant to this case would describe the effectiveness of a *subset* of *qui tam* actions—those in which the government does not intervene.

Department of Justice reports indicate that such actions, relative to *qui tam* actions in which the government does intervene, have not resulted in a "boon to the federal treasury." As of October 1998, the government had recovered $2.189 billion in cases in which it had intervened but only $60 million in cases in which it had not. *See Justice Department Recovers More than $2 Billion in False Claims Act Awards and Settlements* (Dep't of Justice press release Oct. 23, 1998). These statistics indicate that less than 2.7% of total recovery under the FCA's *qui tam* provisions comes from actions in which the government does not intervene. The cases in which the government intervenes—cases that are not affected by our holding—are generally the meritorious cases. Hence, the dissent's implicit suggestion that our decision today

## VI.

The dissent suggests that *qui tam* actions in which the government does not intervene are constitutionally acceptable as valid delegations of executive authority. There are two problems with this analysis.

First, there is no real delegation of executive authority in such cases. Congress cannot be delegating to relators the President's power and duty to take care that the laws be faithfully executed, for Congress may not delegate purely executive power without the acquiescence of the Executive. The Executive Power Clause vests the executive power *solely* in the President, *see* U.S. CONST. Art. II, § 1 ("The executive Power shall be vested in a President of the United States of America."), so any delegation of executive power must come from the Executive.[44] There is certainly no express delegation of executive power from the Attorney General to *qui tam* relators, and we disagree with the dissent's assertion that a decision not to intervene in a *qui tam* action is appropri-

ately viewed as an implicit delegation of executive authority to the relator.

The meaning of an Attorney General's decision not to intervene is ambiguous at best. It might represent his belief that the *qui tam* action would harm the government's interests; for example, a suit against a defense contractor may lead to the divulging of sensitive information. There is no way to tell, from a mere decision not to intervene, whether the Attorney General is saying to the relator, "We don't have the resources to pursue this action; go ahead and do it for us," or "Bringing this action is contrary to our interests; don't pursue it."[45]

In addition, the dissent's delegation theory must fail because of the absence of an "intelligible principle" to guide the relator's exercise of his allegedly delegated executive authority. Neither the FCA nor the Attorney General offers a relator any guidance as to how he should exercise his allegedly delegated authority to litigate the government's claims. The relator is not even told to litigate "in the public interest"

disables an effective law enforcement tool is off base.

44. *See* Steven G. Calabresi and Saikrishna B. Prakash, *The President's Power To Execute the Laws*, 104 YALE L.J. 541, 593 (1994) (noting that "the Executive Power Clause grants 'the executive Power' solely and exclusively to the President," so "Congress may not exercise 'the executive Power' itself, nor may it give that power to other subordinate entities"). Cases approving congressional delegation of judicial power, such as those cited by the dissent, are inapposite, for Article III, in contrast to Article II, vests judicial power in "one supreme Court, *and in such inferior Courts as the Congress may from time to time ordain and establish.*" U.S. CONST. Art. III, § 1 (emphasis added). The Constitution thus contemplates congressional delegation of judicial power but not legislative delegation of the President's authority to take care that the laws be faithfully executed.

45. One might argue that if the Attorney General did not want the action brought, he could merely intervene and dismiss the action, so a decision not to intervene must be an implicit delegation. The FCA, however, makes it difficult for the government to dismiss actions it

does not want brought. The government may not intervene in the action and dismiss it over the relator's objections unless the Attorney General obtains court approval—from a democratically unaccountable federal court—after granting the relator a hearing. *See* 31 U.S.C. § 3730(c)(2)(A).

Moreover, if the government does not intervene within 60 days, it cannot, under the FCA's plain text, reenter and dismiss the suit, for in entering a *qui tam* action after initially declining to intervene, the government may not "limit the status and rights of the relator," as it undoubtedly would do if it entered the litigation and sought dismissal of the action. *See id.* § 3730(c)(3). Hence, a strategy of intervention and dismissal is difficult, and a decision not to intervene should not be viewed as an implicit delegation by the Attorney General; it might instead result from a decision that the lawsuit is harmful and should not be pursued.

The case would be different if the FCA required the Attorney General, in announcing his decision not to intervene, to state that he was delegating authority to sue to the *qui tam* relator. Under the current statute, however, it is not appropriate to infer delegation by the Executive from a decision not to intervene.

or "for the public good." Without *any* intelligible principle to constrain the relator's discretion, there can be no valid delegation of executive authority. *See J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624 (1928); *American Trucking Ass'n v. EPA*, 175 F.3d 1027, 1034 (D.C.Cir.1999). The dissent asserts, perplexingly, that the intelligible principle is "the ability of the Executive to intervene in any *qui tam* suit," but the possibility of Executive intervention is not really a guiding principle at all; it in no way assists the relator in figuring out how to exercise his allegedly delegated executive authority.

Because the dissent has not demonstrated (1) a genuine delegation of executive authority or (2) an intellible principle to guide the relator's exercise of such authority, its delegation argument fails to show the constitutionality of FCA *qui tam* actions in which the government does not intervene.

## VII.

The defendants argued forcefully in the district court, and contend now, that Riley's lawsuit also violates Article II of the Constitution because, as a *qui tam* relator suing on behalf of the federal government, Riley is acting as an "officer of the United States" but has not been appointed in conformity with Article II's Appointments Clause.[46]

Defendants contend that the FCA's *qui tam* provisions violate the Appointments Clause by authorizing private parties to initiate and conduct litigation on behalf of the United States—a power properly exercised only by persons who qualify as "officers" under the Appointments Clause. *See, e.g., Buckley*, 424 U.S. 1, 140, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Riley and the government admit that *qui tam* relators are not appointed pursuant to any of the mechanisms set forth in the Appointments Clause, but they aver that relators are not "officers" and that, accordingly, they need not be appointed according to Article II's provisions. Because we affirm the dismissal on the ground that the *qui tam* provisions of the FCA violate the Take Care Clause and the separation of powers doctrine, we, like the district court, find it unnecessary to reach the Appointments Clause issue.[47]

AFFIRMED.

**46.** The Appointments Clause states:
  [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law. But the Congress may by Law vest the appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.
  U.S. CONST. art. II, § 2, cl. 2.
  The Article II arguments the defendants presented in addition to their Article III challenge constitute alternative grounds for affirming the district court's dismissal and are properly before us on appeal. *See Colautti*, 439 U.S. at 397 n. 16, 99 S.Ct. 675 ("Appellees, as the prevailing parties, may of course assert any ground in support of that judgment, 'whether or not that ground was relied upon or even considered by the trial court.'") (quoting *Dandridge*, 397 U.S. at 475 n. 6, 90 S.Ct. 1153); *Wooton*, 869 F.2d at 850 n. 1

("When the judgment of the district court is correct, it may be affirmed on appeal for reasons other than those asserted or relied on below.") (quoting *Terrell*, 792 F.2d at 1362 n. 3).

**47.** In the district court, the University of Texas Health Science Center at Houston defended on the ground, *inter alia*, that, because it is an arm of the state, the Eleventh Amendment forbids suits against it by a private party, absent a waiver of sovereign immunity. In *Foulds*, this court agreed with that analysis, holding that the Eleventh Amendment bars a *qui tam* suit by a relator against a state entity. *See Foulds*, 171 F.3d at 288–94. All parties herein agree that the *Foulds* holding precludes liability on the part of the University of Texas Health Science Center at Houston, and this is an alternate ground for affirmance as to that defendant, which is entitled to dismissal as well under our conclusion that this suit is barred by the Take Care Clause and separation of powers doctrine.

DeMOSS, Circuit Judge, specially concurring:

I concur in parts I, II, III, V, VI and VII of the majority opinion authored by Judge Smith, which hold that *qui tam* actions brought by uninjured relators violate the Constitution's Take Care Clause and the constitutional doctrine of separation of powers when the government has not intervened in the suit. Accordingly, I concur in the judgment of the Court, which affirms the decision of the district court.

I do not agree with and am unable to join in the reasoning and analysis of part IV of the majority opinion,[1] which finds error in the district court's legal determination that Riley lacked Article III standing to bring this suit. In my view, neither precedent nor history, nor any more abstract theory of constitutional or logical analysis requires the conclusion that Riley, who suffered no particularized or personal injury, is blessed with standing to bring this suit on behalf of an otherwise disinterested government. To the contrary, the Supreme Court's recent structuralist approach to jurisdiction heralds a new era in the evolution of the standing doctrine; one in which the rigors of the injury requirement inherent in the case or controversy component of Article III will not be excused on the theory that they constitute mere prudential considerations. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 118 S.Ct. 1003, 1016–20, 140 L.Ed.2d 210 (1998); *see also Federal Election Comm'n v. Akins*, 524 U.S. 11, 118 S.Ct. 1777, 1784–87, 141 L.Ed.2d 10 (1998). Given the very real possibility of en banc or even Supreme Court review, and with no intent to distract or detract from the wisdom of the majority's view with respect to the remaining issues, I write separately to explain why I believe that the district court's conclusion that Riley lacked standing is correct, and why we should take that rationale into account when judging the propriety of the district court's decision dismissing Riley's claims.

## I.  BACKGROUND

Plaintiff-appellant Joyce Riley filed this suit pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729–3733 (the FCA). Those provisions authorize individual citizens to sue on behalf of the government for fraud committed against the government. The *qui tam* provisions ultimately permit a successful individual plaintiff—called a "relator"—to collect part of the government's recovery. Riley filed a preliminary statement under seal, which the U.S. Department of Justice reviewed at length. *See* 31 U.S.C. § 3730(b)(2). Having reviewed Riley's statement, the government declined its right to intervene in the suit, *see* § 3870(b)(4)(B), and Riley proceeded on her own in the district court.

After Riley filed her original complaint, the various defendants filed motions to dismiss for failure to state a claim. The district court denied each motion, but requested additional briefing to address Riley's standing under Article III of the Constitution. Riley, the University of Texas Health Science Center, and the United States, as intervenor for the limited purpose of defending the FCA's constitutionality, briefed the standing issue. Riley then filed a second amended complaint, which was met with another round of motions to dismiss under Rule 12(b)(6).

The district court dismissed Riley's claims on jurisdictional grounds, concluding that Riley lacked Article III standing because she had not even alleged any personal injury in fact, which is part of the "irreducible constitutional minimum" that must be shown to establish Article III standing. *See United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 982 F.Supp. 1261, 1268 (S.D.Tex.1997). The district court further held that there was no con-

---

1. Judge Stewart joined part IV of Judge Smith's majority opinion in footnote two of his dissenting opinion, making the discussion therein the majority view.

stitutionally valid analysis that would permit Riley to pursue her fraud claims for injury to the government. Specifically, the district court held that Congress could not, by way of the FCA's *qui tam* provisions, legislatively delegate or assign to a private citizen the right to pursue the government's interest with respect to claims that would otherwise be constitutionally vested within the control of the Executive branch. *See id.* at 1264–69.

Riley appealed, arguing that *qui tam* relators suing under the FCA have standing to sue on behalf of the United States, even when the United States has declined to prosecute the suit on its own. Riley offers a variety of theories in support of her position. Specifically, Riley argues that the standing of *qui tam* relators is well-established by binding precedent, that the constitutional validity of *qui tam* actions is proven by a long and illustrious history of congressional usage, and finally, that Article III standing concerns about *qui tam* suits are answered by any number of more abstract constitutional theories, including the statutory permission theory, the assignment theory, the retaliation theory, and the bounty theory. I will begin with a brief statement of Article III principles and then consider each of these arguments in turn.

## II. GENERAL PRINCIPLES

Federal court jurisdiction extends only to "cases" and "controversies." U.S. CONST. art. 3, § 2; *see also Steel Co.*, 118 S.Ct. at 1016; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Standing is an essential and constitutionally mandated part of the case or controversy requirement of Article III, *see Lujan*, 112 S.Ct. at 2136, which prevents the judicial process from being merely "a vehicle for the vindication of the value interests of concerned bystanders," *Valley Forge Christian College v. Americans United for Separation*, 454 U.S. 464, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Although standing may be informed by some prudential considerations as well, the Supreme Court has unambiguously defined three indispensable elements that comprise the "irreducible constitutional minimum" required to establish Article III standing. *See Lujan*, 112 S.Ct. at 2136.

"First, the plaintiff must have suffered an 'injury in fact.'" *Lujan*, 112 S.Ct. at 2136; *see also Steel Co.*, 118 S.Ct. at 1016–17; *Association of Community Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir.1999). The alleged injury must be "actual or imminent," as opposed to "conjectural" or "hypothetical." *See Lujan*, 112 S.Ct. at 2136. Of equal importance, the alleged injury must be concrete and particularized in the sense that it "affects the plaintiff in a personal and individual way." *Id.* at 2136 & n. 1.

Second, there must be causation. *See Steel Co.*, 118 S.Ct. at 1016–17; *Lujan*, 112 S.Ct. at 2136. Causation is established when the plaintiff's alleged injury is directly related to the defendant's objectionable conduct, and is "not the result of the independent action of some third party not before the court." *Lujan*, 112 S.Ct. at 2136. Finally, "there must be redressibility." *Steel Co.*, 118 S.Ct. at 1017. Redressibility is established when there is a likelihood that the requested relief will redress the plaintiff's alleged injury. *Steel Co.*, 118 S.Ct. at 1017; *Lujan*, 112 S.Ct. at 2136.

No one contends that the Supreme Court has ever explicitly waived or excused failure to comply with these fundamental standing requirements, whether in a *qui tam* suit or any other type of suit. To the extent there could be any remaining doubt, surely *Steel Co.* and *Lujan* foreclose any argument that an uninjured plaintiff, who by definition has not suffered any cognizable personal injury, nonetheless enjoys Article III standing.

No one claims that Riley herself has sustained the type of concrete and personalized injury required to satisfy the rigors

of Article III. That fact alone would seem to preclude a finding of standing in this case. But Riley's articulated theories of standing, and the theories relied upon by those of our sister circuits that have permitted uninjured *qui tam* relators to proceed with suit, are premised upon the proposition that such relators "stand in the shoes" of the government with respect to the injury caused by the fraudulent claims. If Riley is to stand in the government's shoes, then we must come up with some constitutionally competent explanation for explaining how she got there.

## III. THE PRECEDENT ARGUMENT

### A. *Supreme Court Precedent*

Riley contends that the Supreme Court either implicitly or explicitly approved of *qui tam* relator standing under the FCA in four cases. In three of those cases, *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997); *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943); and *Marvin v. Trout*, 199 U.S. 212, 26 S.Ct. 31, 50 L.Ed. 157 (1905), the Supreme Court decided *qui tam* cases brought under the FCA (*Hughes* and *Hess*) or some other statute (*Marvin*) without questioning its Article III ability to do so. Thus, Riley reads the Supreme Court's failure to address standing *sua sponte* as an implicit assertion that standing existed in each case. This reasoning is inherently suspect. *See Giles v. NYLCare Health Plans, Inc.*, 172 F.3d 332, 336 n. 2 (5th Cir.1999) ("Even though subject matter jurisdiction can be raised *sua sponte*, we take nothing away from our failure to do so in these cases."). But there are even better reasons for rejecting the "implicit" holdings suggested by Riley.

The first case, *Marvin v. Trout*, 199 U.S. 212, 26 S.Ct. 31, 50 L.Ed. 157 (1905), did not present any question related to the *qui tam* provisions of the False Claims Act, the statute at issue here. To the contrary, *Marvin* involved only the constitutional validity of an Ohio state statute

that was applied in that case to permit a spouse to recover gambling losses from, inter alia, the owner of the gambling establishment where the losses were incurred. The Supreme Court noted that no well-defined constitutional issues had been presented to the lower courts or to the Supreme Court. *Id.* at 33–34. Indeed, the Supreme Court noted that the federal issues involved were so poorly defined that similar petitions had been held to raise no federal issue at all. *Id.* at 34–35. Nonetheless, in a subsequent discussion assuming that there was a due process violation at issue, the Supreme Court first raised and then rejected the argument that every action brought by an informer to recover a penalty or forfeiture granted by statute would be per se unconstitutional. *Id.* Given the limitations on both the issues presented and the holding in *Marvin*, that case cannot be cited with any credibility as a considered holding on the issue of standing under the FCA.

Only two of Riley's four Supreme Court cases, *Hughes* and *Hess*, involved the *qui tam* provisions set out in the FCA, the statute at issue in this case. It is abundantly clear from the text of *Hughes* itself that the Supreme Court did not intend any "implicit" holding on the issue of Article III standing. Indeed, the writ of certiorari in *Hughes* was expressly limited to "the nonconstitutional questions presented by the petition" for writ of certiorari. *Hughes*, 117 S.Ct. at 1875 n. 3. The "constitutional challenges to the *qui tam* provisions" of the FCA, which were presented to and decided by the courts below, and which included the argument that *qui tam* relators lack standing, *see United States ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1520–21 (9th Cir.1995), *vacated*, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997), were simply not before the Supreme Court for decision. *Hughes*, 117 S.Ct. at 1875 n. 3. Instead, the *Hughes* court decided the case on a merit-based issue of statutory construction. *See id.* at 1878.

*Hess* may skate a little closer to some of the constitutional concerns raised by the FCA's *qui tam* provisions, but the case is likewise silent on the issue of the Article III requirement for an injury in fact, or any of the other fundamental elements of Article III standing. To the contrary, the disposition in *Hess*, like the disposition in *Hughes*, is based upon an issue of merit-based statutory construction. *See Hess*, 63 S.Ct. at 383–84.

The timing and context of *Hess*, and the plain language used in *Hughes*, compels the conclusion that the Supreme Court did not intend to reach any issue relating to Article III standing in those cases. *See* Ara Lovitt, Note, *Fight for Your Right to Litigate: Qui Tam, Article II, and the President*, 49 STAN. L.REV. 853, 855 n. 12 (1997) (suggesting, in 1997, that the Supreme Court may be waiting upon a circuit split to directly address the standing of *qui tam* relators); *see also* Edward A. Hartnett, *The Standing of the United States: How Criminal Prosecutions Show that Standing Doctrine is Looking for Answers in all the Wrong Places*, 97 MICH. L.REV. 2239, 2243–45 (1999) (explaining how courts have avoided reconciling the injury in fact standing requirement with ancient *qui tam* practice). Significantly, all four of the Supreme Court cases Riley relies upon, including *Hughes* and *Hess*, were decided before *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). *Steel Co.* considered and rejected the argument that the Court can assume hypothetical jurisdiction to reach the merits in a case without regard to whether the parties have raised a disputed question relating to Article III jurisdiction. *See id.* at 1012–15 & n. 3 (noting the absence of any Supreme Court cases addressing the merits before first answering any "disputed question of Article III jurisdiction"). For these reasons, the Court should reject Riley's invitation to draw any meaningful inference from the Court's silence in *Marvin*, *Hess*, and *Hughes* on the important issue of Article III standing.

The fourth Supreme Court case, which Riley reads more broadly as explicitly holding that a *qui tam* relator has Article III standing is *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)—the very case the district court cited for the proposition that *qui tam* relators who lack a personalized injury also lack Article III standing to sue. *Lujan* involved a challenge to a rule promulgated by the Secretary of the Interior interpreting certain provisions of the Endangered Species Act. *See id.* at 2135. The Supreme Court stated that the rule at issue could not vest private citizens with standing to sue on the theory that the statutory provisions involved created "an abstract, self-contained, noninstrumental 'right' to have the Executive observe the procedures required by law." *Id.* at 2143. In reaching that conclusion, the Court distinguished the issue presented from the "unusual case in which Congress has created a concrete private interest in the outcome of a suit against a private party for the government's benefit, by providing a cash bounty for the victorious plaintiff." *Id.* at 573, 112 S.Ct. 2130. To the extent this is relevant at all in this FCA suit, it is plainly dictum used to define the scope of the *Lujan* decision, rather than any explicit approval of *qui tam* actions under the FCA or, for that matter, *qui tam* actions in general. As in *Hughes*, *Hess*, and *Trout*, the standing of *qui tam* relators under the FCA was simply not before the *Lujan* Court.

To sum up, Riley has not offered any binding or persuasive authority that the Supreme Court has either implicitly or explicitly closed the door on arguments that *qui tam* relators under the FCA lack standing.

### B. *Fifth Circuit Precedent*

The majority somewhat reluctantly concludes that Fifth Circuit precedent precludes a holding that Riley lacked Article III standing in this case. The majority

opinion's analysis on this important issue in our Circuit is based upon the purported binding effect of a passing footnote reference in *United States ex rel. Foulds v. Texas Tech University*, 171 F.3d 279, 288 n. 12 (5th Cir.1999), *petition for cert. filed*, 68 U.S.L.W. 3138 (Aug. 23, 1999) (No. 99-32).

While I agree, and even applaud the majority opinion's reasoning with respect to the remaining constitutional issues, I am not persuaded that *Foulds* or any other Fifth Circuit case constitutes binding precedent competent to waive the Article III requirement of a particularized and personal injury in *qui tam* suits. Moreover, and without regard to the binding effect of the brief sub-textual reference to standing in *Foulds*, it seems very likely that this case will invite en banc scrutiny, and I therefore think it appropriate that a more comprehensive analysis of the *Foulds* opinion, and the majority's treatment of that opinion, be available to the en banc court.

*Foulds* includes the following language in footnote 12:

> No one has challenged [relator] Fould's standing in this case. We must, however, consider possible objections to standing *sua sponte*. *Lang v. French*, 154 F.3d 217, 222 (5th Cir.1998). Our court has explicitly found that qui tam plaintiffs have standing. *United States ex rel. Weinberger v. Equifax, Inc.*, 557 F.2d 456, 460 (5th Cir.1977). As noted in a district court opinion concluding that relators lack standing, since our opinion in *Equifax*, the Supreme Court has refined its standing jurisprudence. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 982 F.Supp. 1261 (S.D.Tex.1997). Yet, with regard to this issue, we consider persuasive a recent Supreme Court decision dealing with a qui tam issue under the False Claims Act. *See Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) (holding that portions of the 1986 amendments to the Act do not apply retroac-

tively). The *Hughes Aircraft* Court did not raise any standing objections.

*Foulds*, 171 F.3d at 288 n. 12.

I do not believe that this brief footnote reference constitutes a considered and binding holding on the issue of the Article III standing of *qui tam* relators. First of all, the *Foulds* panel did not need to reach the issue of the relator's standing in order to resolve the dispositive question in that case, *i.e.*, whether the Eleventh Amendment barred the relator's claims against state entities. As the panel correctly noted, the Eleventh Amendment issue was itself jurisdictional, and sufficient to dispose of the case. *See Foulds*, 171 F.3d at 285–88.

The majority disagrees. Curiously, the majority first characterizes the purportedly controlling language in *Foulds* as "no more than a passing reference," but then concludes that that passing reference is nonetheless binding on novel issues that were never briefed or otherwise placed in dispute in *Foulds*. This remarkable conclusion was drawn from *Calderon v. Ashmus*, 523 U.S. 740, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998), which held that the particular action for declaratory judgment and injunctive relief at issue in that case did not present a justiciable controversy within the meaning of Article III. *Calderon* was not a standing case, and did not set forth any new jurisdictional or jurisprudential rule that standing must in all cases be addressed sua sponte by a federal court prior to consideration of any other jurisdictional limitations. Rather, *Calderon* merely noted that Eleventh Amendment limitations are not co-extensive with those basic limitations upon the federal judicial power specified in Article III of the Constitution, and then observed that reviewing the case for compliance with Article III's case or controversy requirement prior to addressing the Eleventh Amendment issue was more "in keeping with" the Supreme Court's "precedents." *Id.* at 1697 & n. 2.

The majority reads *Calderon*'s observation that the Eleventh Amendment is not co-extensive with Article III as a holding that Article III is in some undefined way "a more 'basic' jurisdictional requirement." The majority reads *Calderon*'s statement that resolving the Article III issue in that case before reaching the Eleventh Amendment issue in that case was more "in keeping with" the Supreme Court's existing precedent as a holding that Article III questions must always in every case be addressed before Eleventh Amendment questions. The majority concludes that the *Foulds* panel's discussion of standing was therefore, under *Calderon,* a necessary and essential part of the holding in *Foulds*.

There are several problems with this analysis. First, I believe that what a particular decision "held" must be judged, not by external authority that could hypothetically have directed the result, but by what the particular panel of the Court wrote down on the pages comprising the decision. Thus, I reject the notion that our judgment about what constitutes the holding in *Foulds,* and what mere dicta, must necessarily be informed by resort to the external legal authority in *Calderon*.

Second, the majority's conclusion that Article III limitations are more "basic" than Eleventh Amendment is presumably based upon the fact that Eleventh Amendment objections to the court's jurisdiction can be waived, while Article III requirements go directly to the power of the court and may not. *Foulds* examined this difference for the purpose of characterizing the Eleventh Amendment issue presented as jurisdictional. The Court stated that the significance of the Eleventh Amendment "lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art[icle] III of the Constitution." *Foulds,* 171 F.3d at 285. *Foulds* then quoted from the *Calderon* language relied upon by the majority in this case. *Foulds* acknowledged *Calderon*'s statement that the Eleventh Amendment and Article III are not co-extensive, but reiterated this Court's view, as established by numerous cases, that the Eleventh Amendment, while "not part and parcel of the Article III restrictions," nonetheless partakes of subject matter jurisdiction. *See id.* at 285–86 & n. 9. Thus, *Foulds* itself seems to belie the majority's conclusion that *Calderon* mandates a world in which Article III questions take primary place over Eleventh Amendment questions in all circumstances.

Further, to the extent that *Calderon* could be read to so hold, that premise is completely negated by the Supreme Court's disposition of the appeal from our en banc decision in *Marathon Oil Co. v. Ruhrgas,* 145 F.3d 211 (5th Cir.1998) (en banc). *See Ruhrgas v. Marathon Oil Co.,* 526 U.S. 574, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999). In *Marathon Oil,* a majority of this en banc court held that in removed cases, the district courts must first decide non-waiveable issues of subject matter jurisdiction before reaching any waiveable issues of personal jurisdiction. *See Marathon Oil,* 119 S.Ct. at 1569. The Supreme Court reversed, holding that while a determination on the issue of subject matter jurisdiction must necessarily precede any determination on the merits, "the same principle does not dictate a sequencing of jurisdictional issues." *Id.* at 1570. Rather, the decision to reach subject matter jurisdiction before other jurisdictional issues is one for the Court's discretion. *See id.* at 1572. The Court recognized that in "most instances" a determination of the Court's subject matter jurisdiction would not involve any arduous inquiry. *See id.* When, however, a relatively straightforward jurisdictional basis for disposing of the case is available, the Court does not abuse its discretion by seizing upon that course rather than reaching a difficult and novel question that would be required to determine the Court's subject matter jurisdiction. *Id.*

Stated simply, *Marathon* abolishes any inference from *Calderon,* that the *Foulds*

panel must have necessarily decided the Article III issue to reach its determination that the Eleventh Amendment posed jurisdictional barriers. To the contrary, the novelty of the standing issue in light of recent Supreme Court precedent and the difficulty of reaching an informed decision in the absence of any briefing or adversarial argument, explains why the *Foulds* panel restricted the standing issue to footnote dicta and decided the case instead on the Eleventh Amendment grounds. As further support for this conclusion, I would note that our Court has twice, since the purported "holding" in *Foulds,* declined to engage the more difficult standing issue, deciding the cases on the basis of more accessible jurisdictional arguments instead. If *Foulds* were as clear as the majority suggests, there would be no reason to expressly avoid stating that uninjured *qui tam* relators have standing to sue under the FCA. *See United States ex rel. Russell v. Epic Healthcare Management Group,* 193 F.3d 304, 307 (5th Cir.1999) (involving *qui tam* provisions of the FCA, and stating "[w]e need not here join the debate over a relator's standing under Article III"); *see also TTEA v. Ysleta Del Sur Pueblo,* 181 F.3d 676, 683 n. 1 (1999) (involving *qui tam* provision relating to the rights of an Indian tribe, and stating that standing was not directly relevant because a holding that the *qui tam* relator lacked standing would only solidify the Court's conclusion that there was no jurisdiction to grant declaratory relief). For the foregoing reasons, I conclude that an Article III decision was not essential to the Court's Eleventh Amendment disposition in *Foulds.* The language in footnote 12 of *Foulds* is therefore simply dicta, which is not binding upon this panel.

In addition to the reasons given above, I note that the purported "holding" in *Foulds* is not supported by any reasoned analysis of the issue in the text of that opinion. Moreover, and as will shortly be clear, the purported "holding" is not supported by any citations that plainly require

the conclusion that uninjured *qui tam* relators have standing under the FCA even when the government does not choose to intervene.

*Foulds* cites two primary authorities: this Court's opinion in *United States ex rel. Weinberger v. Equifax,* 557 F.2d 456, 460 (5th Cir.1977), and the Supreme Court's opinion in *United States ex rel. Schumer v. Hughes Aircraft Co.,* 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). As discussed above, *Hughes* simply did not decide any constitutional issues at all. To the contrary, the *Hughes* Court expressly avoided reaching any decision concerning the Article III standing of *qui tam* relators, notwithstanding the fact that the issue was presented and decided below. *See Hughes,* 117 S.Ct. at 1875 n. 3. *Hughes,* therefore, is no authority at all with respect to Article III standing.

*Foulds* also cited this Court's decision in *Weinberger.* Although *Weinberger* held, in 1977, that uninjured *qui tam* relators have standing, even the *Foulds* panel recognized that the force of that case has been substantially undermined by refinements in the Supreme Court's treatment of Article III standing. *See Foulds,* 171 F.3d at 288 n. 12. *Weinberger* was decided long before the Supreme Court clarified the constitutional scope of Article III standing in cases such as *Steel Co. and Lujan.* Aside from *Foulds,* the Court has only cited the *Weinberger* decision one time for the proposition that *qui tam* relators enjoy Article III standing, *see United States ex rel. Weinberger v. State of Florida,* 615 F.2d 1370, 1370 (5th Cir.1980), and even then, the reference was only in passing and was not material to the disposition of the case. So much for the proposition that *Weinberger* amounts to seminal Fifth Circuit precedent. Moreover, the reasoning supporting the relevant holding in *Weinberger* is brief, and merely states that Congress granted standing by passing the statute, without examining whether Congress has any authority to do so. *Wein-*

*berger,* 557 F.2d at 460. The statutory permission theory of *qui tam* relator standing poses significant constitutional questions, some of which are addressed in the majority's analysis and some of which are addressed in the following section.

Having negated the premise that binding precedent places Riley squarely in the shoes of the government, I will now examine whether any of Riley's more abstract constitutional theories are competent to place her there.

## IV. RILEY'S ALTERNATIVE THEORIES

### A. Statutory Permission Theory

Riley first argues that relators meet standing requirements because Congress has said that they do. In other words, Riley claims that the FCA is a statutory grant of standing to *qui tam* relators. A few decisions, including this Court's decision in *Weinberger,* have taken this "statutory permission" approach. *See, e.g., United States ex rel. Woodard v. Country View Care Ctr., Inc.,* 797 F.2d 888, 893 (10th Cir.1986) ("The statute of course eliminated any standing problem"); *Weinberger,* 557 F.2d at 460 (reasoning that "the statute clearly accords [the relator] standing to bring the action").

But the statutory permission approach fails because Congress is itself constrained by the Constitution. The Constitution requires a personalized injury, and Congress cannot, by legislation, waive that requirement. *See Raines v. Byrd,* 521 U.S. 811, 117 S.Ct. 2312, 2318 n. 3, 138 L.Ed.2d 849 (1997) ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing."). Those courts that have adopted the statutory permission approach likely viewed the injury element as a prudential standing requirement that Congress could waive. Indeed, earlier Supreme Court opinions referred to waiveable prudential standing requirements.

*See, e.g., Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 2206 & n. 12, 45 L.Ed.2d 343 (1975). But the Court has now stated, without equivocation, that a particularized and personal injury is a constitutional—not a prudential—standing requirement, which cannot be waived by legislation. *See Lujan,* 112 S.Ct. at 2136.

The courts that have adopted the statutory permission approach may also have confused Congress's power to create rights with the power to create standing. Congress can, of course, enact statutes creating new substantive legal rights, the invasion of which can give rise to the kind of particularized injury necessary to create standing. *See Linda R.S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 1148 n. 3, 35 L.Ed.2d 536 (1973). In no event, however, "may Congress abrogate the article III minima: A plaintiff must always have suffered 'a distinct and palpable injury to himself' ... that is likely to be redressed if the requested relief is granted." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). In light of more recent Supreme Court authority, such as *Steel Co.* and *Lujan,* those cases relying upon a statutory permission theory and the statutory permission theory itself, must fail.

### B. Assignment Theory

Riley contends that she also has standing as an "assignee" of the government's fraud claim. Indeed, some courts have approved of relator standing on the theory that the *qui tam* relator is an assignee of the government's own fraud action. *See, e.g., United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 748 (9th Cir.1993) ("the FCA effectively assigns the government's claims to qui tam plaintiffs ... who then may sue based upon an injury to the federal treasury"). Under the assignment theory, the FCA *qui tam* provisions operate as an enforceable unilateral contract, the terms of which are accepted by the relator upon the filing of suit. *See id.* at 748.

There are several difficulties with the assignment theory. First of all, the FCA's language contains no mention of an assignment. Courts may not simply re-write statutes in order to make them constitutional. Moreover, the assignment theory is really just a variation of the statutory permission theory, and the same criticism applies: Congress cannot circumvent the standing requirement by conferring standing, even if it does so using the assignment mechanism.

Riley asserts that it is not important to inquire whether an actual assignment has occurred; the fact that courts permit assignment indicates that a personalized injury is not an absolute pre-requisite to Article III standing. This premise conflicts with express language in *Lujan*, which states that "the injury must affect the plaintiff in a personal and individual way." *Lujan*, 112 S.Ct. at 2136 n. 1. Absent a valid assignment, there is absolutely no justification for excusing the requirement that the plaintiff allege a particularized and personal injury.

The "assignment" in the FCA does not comport with basic principles of contract law and thus cannot be a valid assignment. First of all, an assignor must give up his interest in that which has been assigned. *See* RESTATEMENT (SECOND) OF CONTRACTS § 317(1) (1980). But the FCA provisions permit the government to retain, not only an interest in the lawsuit, but control over certain aspects of the lawsuit. For example, the government can settle the case over the relator's objections. *See* 31 U.S.C. § 3730(c)(2)(B). The government can dismiss the case over the relator's objections. *Id.* at § 3730(c)(2)(A).

The "assignment" purportedly made in the FCA must also fail because Article II § 3 vests the right to prosecute with the Executive branch, while the assignment of that right to a private citizen is being made in the FCA by the Legislative branch. Congress cannot assign something it does not "own." Finally, no legal right to prosecute a fraud claim existed at the time the supposed "offer" of assignment is claimed to have been made (*i.e.*, at the enactment of the FCA). Thus, the FCA *qui tam* provisions should be viewed, at the most, as a promise to make an assignment in the future, rather than an actual assignment.

The assignment exception to the personalized injury requirement should be narrowly confined to those cases in which the assignee really "steps into the shoes" of the assignor. There are simply too many differences between a valid assignment and the FCA's *qui tam* provisions to conclude that the FCA's *qui tam* provisions set out a valid Congressional assignment of the Executive right to prosecute a case for injury to the government. Hence, the assignment theory must also fail in this case.

## C. Retaliation Theory

Riley argues that she was injured, and thus has standing, because her employer retaliated against her for filing her *qui tam* action. Her reasoning echoes that of a few courts that have found that *qui tam* relators meet the injury requirement because they are likely to face retaliation for initiating a *qui tam* suit. *See, e.g., United States ex rel. Dunleavy v. County of Delaware*, 123 F.3d 734, 739 (3d Cir.1997); *United States ex rel. Neher v. NEC Corp.*, 11 F.3d 136, 138 (11th Cir.1993). Those courts assert that the possibility of the extreme emotional strain resulting from exposure to the fraudulent scheme, or the time and expense required to bring suit, or the possibility of retaliation for filing the suit, may serve as the injury in fact that confers standing.

The defendants correctly note that this argument proves too much. If the emotional, financial, or retaliatory costs of filing a lawsuit constitute an injury upon which standing may rest, then every plaintiff will be blessed with standing. The defendant, after all, could *always* retaliate. The Supreme Court recently eliminated

any doubt as to the validity of the retaliation theory, stating:

> Obviously, ... a plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit. The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a by product of the litigation itself.

*Steel Co.*, 118 S.Ct. at 1019. The possibility of retaliation—like emotional and litigation-based transaction costs—are "by product[s] of the litigation itself" and thus cannot be grounds for standing to litigate.

Furthermore, the "retaliation" claim is expressly dealt with in subsection (h) of § 3730. That subsection gives an "employee" who is "discriminated against in the terms and conditions of employment by his or her employer" an entitlement to "all relief necessary to make the employee whole." 31 U.S.C. § 3730(h). This subsection further gives the employee the right to "reinstatement," two times back pay, interest on back pay, and compensation for any special damages sustained as a result of the discrimination, all of which are relief applicable only against the employer. *Id.* Finally, this subsection gives federal district courts jurisdiction to provide this relief. *Id.* In the present case, subsection (h) may give Riley her own claim (as distinct from the government's claim) against her employer, St. Luke's Hospital, but it could not possibly give Riley any claim against the other defendants named herein. For all of these reasons, Riley's retaliation claim does not support any judgment finding that she has standing to prosecute claims for injury to the government under the FCA's *qui tam* provisions. The retaliation theory must fail.

*D. Bounty Theory*

Riley also argues that she has standing to pursue her FCA action because she has a concrete interest in the outcome of her lawsuit. She argues that the FCA provides a bounty for successful relators, *see*

31 U.S.C. § 3730(d), and relators thus have a concrete interest in succeeding in their fraud actions. Several courts have found standing on the basis of the relator having an interest in the outcome of the litigation. *See, e.g., United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1154 (2d Cir. 1993).

The Supreme Court, however, has required an *injury*—not merely an incentive or interest. Defendants contend that an incentive or interest is not an injury and will not satisfy Article III's injury requirement. *See Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972) (existence of ideological interest to litigate vigorously is not sufficient basis for finding injury in fact); *Valley Forge*, 102 S.Ct. at 766 ("[s]tanding is not measured by the intensity of the litigant's interest or the fervor of his advocacy.").

The presence of a statutory bounty for successful *qui tam* plaintiffs does not satisfy the injury requirement because the injury requirement does more than merely ensure that parties have an incentive to prosecute a claim vigorously. The requirement of a particularized and personal injury also ensures that the judiciary stays in its assigned role as arbiter of disputes and does not wander into the arena of policy making (the Legislature's role) or ensuring the execution of laws (the Executive's role). As the *Lujan* Court explained:

> If the concrete injury requirement has the separation-of-powers significance we have always said, the answer must be obvious: To permit Congress to convert the undifferentiated public interest in executive officers' compliance with the law into an "individual right" vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to "take Care that the Laws be faithfully executed." It would enable the courts, with the permission of Congress, "to assume a

position of authority over the governmental acts of another and co-equal department," and to become " 'virtually continuing monitors of the wisdom and soundness of Executive action.' " We have always rejected that vision of our role.

112 S.Ct. at 2145 (citations omitted); *see also* Antonin Scalia, *The Doctrine of Standing As An Essential Element Of The Separation Of Powers,* 17 Suffolk U.L.Rev. 881 (1983). Requiring merely an incentive, rather than an injury personal to the party in interest, would not adequately circumscribe the judiciary. Permitting a statutory bounty, standing alone, to vest a plaintiff with sufficient interest to bring suit inherently involves an impermissible encroachment upon the separation-of-powers principles that lie at the heart of the Constitution. I therefore conclude that the bounty theory must likewise fail.

## V. THE HISTORICAL ARGUMENT

I cannot close without commenting briefly upon Riley's final argument, which is that the historical pedigree of *qui tam* suits compels us to conclude that *qui tam* relators have standing. I recognize that "[s]tanding to sue is part of the common understanding of what it takes to make a justiciable case." *Steel Co.,* 118 S.Ct. at 1016. For that reason, and as noted in the majority opinion, the Supreme Court has on occasion permitted history to play a supporting role in its constitutional analysis. But even the dissent must concede that history alone cannot validate an unconstitutional practice. *See Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 3335, 77 L.Ed.2d 1019 (1983); *see also Walz v. Tax Commission,* 397 U.S. 664, 90 S.Ct. 1409, 1416, 25 L.Ed.2d 697 (1970). Indeed, in those circumstances in which the Supreme Court has deferred in any significant measure to historical usage, the constitutional implications of the challenged practice were debated by the adopting Congress. The practice was then employed in a manner so consistent and so

free of ambiguity that the practice can fairly be said to constitute "part of the fabric of our society." *See Marsh,* 103 S.Ct. at 3334–36 & n. 12.

*Qui tam* provisions simply do not meet this threshold. As the majority points out, many of the early *qui tam* provisions differed substantially from the FCA provisions at issue here by merely granting an informing citizen a reward, rather than permitting those citizens to sue on behalf of an otherwise disinterested government. Moreover, and as described in the dissenting opinion, the use of the *qui tam* provisions has been sporadic at best.

Judge Stewart's dissent attempts to explain the distinctions drawn by the majority between the *qui tam* provisions at issue in this suit and their historical antecedents. His dissent also attempts to explain historical gaps in which *qui tam* suits were not employed. Indeed, I am impressed by the breadth of the dissenting analysis. But ultimately history, while important, is neither sacrosanct nor supreme—particularly where, as here, there is no indication that the adopting legislatures debated the constitutional questions, and the historical practice at issue has been only sporadically or incompletely employed. In the final analysis, I am persuaded that the historical credentials offered by Riley and appearing in the dissenting opinion do not justify the radical departure from fundamental and well-settled Article III jurisprudence that would be required to permit a *qui tam* plaintiff to sue in the absence of a particularized injury personal to the plaintiff.

## CONCLUSION

The district court correctly recognized that relator standing is inconsistent with contemporary standing doctrine, that the precedent to the contrary is unpersuasive because it relies on outdated or fallacious legal reasoning, and that the historical credentials of *qui tam* actions are not enough to rescue the practice.

For the forgoing reasons, I would affirm the district court's holding that Riley lacked the particularized and personal injury required to establish Article III standing in this case in which the Attorney General declined to intervene and take over prosecution of the government's fraud claims.

CARL E. STEWART, Circuit Judge, dissenting:

The *qui tam* relator provisions of the False Claims Act provide a pecuniary and, ultimately, useful, tool to ensure that the civil laws are obeyed. The provisions allow concerned citizens to protect the government's interest in ensuring that its laws are followed by rewarding individuals who bring complaints forward and then assist the government in the prosecution of those claims.[1] More importantly to the case at bar, the *qui tam* law enables the Attorney General to maximize her resources by not requiring her and her staff to seek out every violation of the federal law. Indeed, the *qui tam* relator provisions represent an invaluable aid in detecting low-visibility offenses to the public purse.

In my opinion, the *qui tam* relator provisions of the False Claims Act are consistent with the Take Care Clause of Article II, even when the government elects not to intervene in an action filed by a relator. An examination of the historical pedigree of this statute and others like it, coupled with an inquiry into the separation of powers concerns raised by the majority, reveals that the *qui tam* provisions comply with the Constitution. Because my colleagues reach a different conclusion, I respectfully dissent.[2]

I

A

The majority observes, ante at 519 and I heartily agree, that history does not "by itself" validate the constitutionality of the *qui tam* relator provisions of the False Claims Act ("FCA").[3] Indeed, no set of historical credentials should ever be worthy of our "blind deference." Ante at 519. Where the majority falters in its discussion, *see* ante at 518–20, of the historical antecedents to this law, however, is in believing Riley and the government to have advanced such a sweeping argument. On the contrary, neither Plaintiff–Appellant nor the Intervenor ever suggests that the *qui tam* relator provisions in the FCA should be validated solely on the basis of history. Instead, Riley and the government argue, in my opinion persuasively, the more refined proposition that *qui tam*'s historical tradition "sheds light not only on what the draftsmen intended [the Take Care Clause] to mean, but also on how they thought that Clause applied to the practice authorized by the First Congress—their actions reveal their intent."[4] In other words, when assessing the *qui*

---

1. Indeed, the Supreme Court cynically opined that *qui tam* relators "are motivated primarily by prospects of monetary reward rather than the public good." *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997).

2. The majority discusses at length the propriety of Plaintiff–Appellant's standing to bring her claim in federal court, *see* ante at 519–23, ultimately concluding that a recent opinion of this court confers standing upon her. *See* ante at 521–22. That opinion, *United States ex rel. Foulds v. Texas Tech Univ.*, 171 F.3d 279 (5th Cir.1999), indeed provided that a *qui tam* relator who has not suffered personalized injury may nonetheless have standing to bring

a case even where the government does not intervene in the case. *See* 171 F.3d at 288 n. 12. Since I agree with the majority's conclusion that *Foulds* controls this case, I pause only to add that I believe that Riley has standing in this case even in light of *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 1016–20 (1998), which limited standing in certain areas but did not completely foreclose a plaintiff's ability to bring a claim despite the absence of a personalized injury.

3. 31 U.S.C. § 3730(b)-(f) (1994).

4. *Marsh v. Chambers*, 463 U.S. 783, 790, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983).

*tam* provisions in light of the Take Care Clause, we should view history as a touchstone illuminating our way, not as a dispositive treatment.

By contrast, the majority's rigid approach to the history of the *qui tam* relator provisions fails to accord any weight to the role of history in constitutional analysis. The majority relies, ante at 519, on *Marsh v. Chambers* seemingly to conclude that we may turn to history only when it amounts to an "unambiguous and unbroken history." Although the *Marsh* Court referred to the "unique history" of the legislative practice of opening each session with a prayer by a state-funded chaplain to legitimize this practice,[5] the Court has never suggested, in *Marsh* or elsewhere, that such a difficult threshold showing is necessary each and every time history is utilized in constitutional adjudication. By scanning the history of the *qui tam* laws, finding inconsistencies therein, and then declaring that history so ambiguous and broken that it should be entirely excluded from our analysis, the majority eliminates the usefulness of that history as an implement with which to understand and to interpret the relevant constitutional language.[6] As the Supreme Court long ago explained,

> The necessities which gave birth to the Constitution, the controversies which preceded its formation, and the conflicts of opinion which were settled by its adoption, may properly be taken into view for the purpose of tracing to its source any particular provision of the Constitution in order thereby to be enabled to correctly interpret its meaning.[7]

This more fluid approach is especially prudent when reviewing separation of powers challenges, such as that presented by the case at bar, because the notions underlying our tripartite government are not explicit in the text of the Constitution.[8] The whole range of history can enlighten our understanding in such a situation because,

> [a]lthough the Court has not considered separation of powers cases to be nonjusticiable, it has had relatively few occasions in which to set out the governing constitutional principles. It is for this reason that there is perhaps less guidance here than in other areas of constitutional law. What principles there are derive from a relatively few "great cases" involving conflicts between two branches of the federal government. Much of the "law" in the area therefore amounts to historical practices, informal and formal, of the various branches, and to understandings that take the Constitution as their starting point but that derive in large part from perceived practical necessities.[9]

With this approach to enactments of the past as a guidepost, I seek below to recast

---

5. *Id.* at 791, 103 S.Ct. 3330.

6. *See, e.g., Mistretta v. United States,* 488 U.S. 361, 401, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (noting that history, in the sense of "'traditional ways of conducting government[,] ... give[s] meaning' to the Constitution") (quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 610, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring)); *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 858, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (faulting petitioner for failing to identify "historical support for the critical link he posits between the provisions of Article III that protect the independence of the federal judiciary and those provisions that define the extent of the judiciary's jurisdiction over state law claims"); *The Pocket Veto Case,* 279 U.S. 655, 689, 49 S.Ct. 463, 73 L.Ed. 894 (1929) (noting that "[l]ong settled and established practice is a consideration of great weight" in constitutional interpretation).

7. *Knowlton v. Moore,* 178 U.S. 41, 95, 20 S.Ct. 747, 44 L.Ed. 969 (1900).

8. *See Printz v. United States,* 521 U.S. 898, 905, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) ("Because there is no constitutional text speaking to this precise question, the answer to the [constitutional] challenge must be sought in historical understanding and practice, in the structure of the Constitution, and in the jurisprudence of this Court.").

9. GEOFFREY R. STONE ET AL., CONSTITUTIONAL LAW 366 (2nd ed.1991).

the history of *qui tam* laws in a more judicious light than the majority's effort.

## B

*Qui tam*[10] actions sprang from thirteenth-century English common law as a method by which to supplement the power of the crown.[11] The artifice of citizens' bringing legal actions on behalf of the sovereign was created at a time in which the legal machinery of the English government was still fairly primordial; consequently, many offenses to the public's interest—such as fraud on the government and general violations of the criminal law—remained undetected and unprosecuted.[12] *Qui tam* actions, in which a private citizen could bring suit on behalf of the sovereign as well as for himself, directly responded to this need, and the government encouraged their filing by rewarding the private citizen with a share of the fine, penalty, or forfeiture.[13] *Qui tam* actions

"became increasingly entrenched in English precedent," and, as Parliament began enacting a variety of specific statutory authorizations, "a consistent part of British legislative policy."[14]

Since *qui tam* statutes dotted the legal landscape in Hanoverian England, it is hardly surprising that the concept of *qui tam* migrated to this side of the Atlantic along with other elements of English law and custom.[15] Indeed, the functionality of *qui tam* laws was sufficiently well-established that our founders did not hesitate in making liberal use of such provisions in statutes passed during the early years of the Republic.[16] Wisely recognizing that the fledgling government did not have the legal machinery in place to prevent fraud against it, members of the first several Congresses drew on the tradition that the English Parliament had established to enact a variety of *qui tam* statutes "to create a self-regulating atmosphere among the

**10.** One subject about which the majority and I do agree is the ancient nature of *"qui tam"* actions. I believe it is worth noting that the phrase itself was at least in circulation at Blackstone's time. *See* 3 WILLIAM BLACKSTONE, COMMENTARIES *160.

**11.** *See* Dan D. Pitzer, *The* Qui Tam *Doctrine: A Comparative Analysis of Its Application in the United States and the British Commonwealth*, 7 TEX. INT'L L.J. 415, 417 (1972); Note, *The History and Development of* Qui Tam, 1972 WASH. U.L.Q. 81, 83.

**12.** *See* Pitzer, *supra* note 11, at 417–18; Note, *supra* note 11, at 83–87.

**13.** *See* Pitzer, *supra* note 11, at 417–18; Note, *supra* note 11, at 83–87.

**14.** *See* Pitzer, *supra* note 11, at 418 (citing 4 WILLIAM S. HOLDSWORTH, A HISTORY OF ENGLISH LAW 355 (1924)); *see also* Note, *supra* note 11, at 90 ("Thus in the seventeenth century the *qui tam* concept had wide acceptance in England. Non-statutory *qui tam* actions may still have been possible, but this was by no means certain. On the other hand, statutory versions of *qui tam* were very much in evidence.").

**15.** *See* Note, *supra* note 11, at 97 ("[I]t seems clear that *qui tam* as it existed in early America was virtually identical to English *qui tam*.

The colonies and newly established states adopted not only the letter but the spirit of this unique procedure.").

**16.** *See, e.g.*, Act of July 31, 1789, ch. 5, § 29, 1 Stat. 29, 45 (customs duties); Act of March 1, 1790, ch. 2, § 3, 1 Stat. 101, 102 (census returns); Act of May 31, 1790, §§ 2, 6, 1 Stat. 124, 125–26 (copyright); Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. 131, 133 (seamen); Act of July 22, 1790, ch. 33, § 3, 1 Stat. 137, 137–38 (Indians); reenacted by Act of Mar. 1, 1793, ch. 19, § 12, 1 Stat. 331; Act of May 19, 1796, ch. 30, § 18, 1 Stat. 474; Act of Mar. 30, 1802, ch. 13, § 18, 2 Stat. 145; Act of June 30, 1834, ch. 161, § 27, 4 Stat. 733–34; Act of August 4, 1790, ch. 35, § 55, 1 Stat. 145, 173 (import and tonnage duties). The majority argues, ante at 519 & n. 12, that some of these statutes are not appropriately viewed as *"qui tam"* provisions because the *qui tam* plaintiff addressed injuries suffered only by himself, and not by the government. My reading of these statutes suggests, on the contrary, that the suits that they authorized redressed injuries suffered *both* by the government and private citizens. Regardless, even if my colleagues' interpretation is the correct one, those statues allowed the filing of suits *in the government's name*. Consequently, whose injury was redressed by the suit does not implicate the Take Care Clause.

predominant trades of the era."[17] As had our English cousins', early American legislatures utilized *qui tam* statutes as a crucial buttress to the government's ability to enforce the laws; indeed, at least seven statutes utilizing *qui tam* provisions were passed by the First Congress.[18]

As the federal government began to expand in the first decades of the nineteenth century, its regulatory and law-enforcement mechanisms became firmly-established and the need for private prosecution of the law naturally waned.[19] Concurrently, public opinion about *qui tam* relators became increasingly negative as various abuses by such relators were revealed; in

particular, critics pointed to the small group of "bounty-hunting" *qui tam* plaintiffs who would settle their claims for amounts prejudicial to the government's best interest.[20] The resulting statutory restrictions on *qui tam* suits significantly limited the attractiveness of such suits.[21]

The Civil War witnessed a renaissance of *qui tam* actions. Widespread reports of corruption and fraud by companies supplying the Union Army gave birth to the *qui tam* provisions found in the False Claims Act of 1863.[22] Indeed, President Lincoln himself suggested that the *qui tam* provisions be inserted into the statute.[23] Some-

**17.** Dorothea Beane, *Are Government Employees Proper* Qui Tam *Plaintiffs?*, 14 J. Legal Med. 279, 282 (1993).

**18.** *See supra* note 16. In addition to these seven statutes, the majority, ante at 520 n. 13, cites six more *qui tam* laws enacted between 1792 and 1872, excluding the FCA. Those later statutes are: (1) Act of Feb. 20, 1792, ch. 7, § 25, 1 Stat. 239 (postal penalties); reenacted Mar. 3, 1845, ch. 43, § 17, 5 Stat. 738; (2) Act of Mar. 22, 1794, ch. 11, §§ 2, 4, 1 Stat. 349 (illegal slave trading); reenacted by Act of Mar. 26, 1804, ch. 38, § 10, 2 Stat. 286; Act of Mar. 2, 1807, ch. 22, § 3, 2 Stat. 426; Act of Mar. 4, 1909, ch. 321, §§ 245–57, 35 Stat. 1140; (3) Act of July 6, 1797, ch. 11, § 20, 1 Stat. 532 (paper duties); adapted by Act of Feb. 28, 1799, ch. 17, § 5, 1 Stat. 623 (same for penalties involving altering stamp duties); (4) Act of May 3, 1802, ch. 48, § 4, 2 Stat. 191 (postal employment); (5) Act of Aug. 5, 1861, ch. 45, § 11, 12 Stat. 296–97 (import duties); (6) Act of July 8, 1870, ch. 230, § 39, 16 Stat. 203 (illegal trade with Indians); reenacted by Act of May 21, 1872, ch. 177, § 3, 17 Stat. 137. One commentator adds five more *qui tam* statutes, all passed in the 1790's, to this list. *See* Harold J. Krent, *Executive Control over Criminal Law Enforcement: Some Lessons From History*, 38 Am. U.L.Rev. 275, 296 n. 104 (1989) (citing (1) Act of March 3, 1791, ch. 15, § 44, 1 Stat. 199, 209 (illegal importation of liquor); (2) Act of June 9, 1794, ch. 65, § 12, 1 Stat. 397, 400 (failure to pay auction duty); (3) Act of June 5, 1794, ch. 48, § 5, 1 Stat. 373, 375 (failure to follow transport regulations); (4) Act of June 5, 1794, ch. 51, § 21, 1 Stat. 384, 389 (failure to pay refined sugar duty); (5) Act of June 5, 1794, ch. 48, § 5, 1 Stat. 376, 378 (failure to pay wine duty)).

**19.** *See* Kent D. Strader, Comment, *Counter Claims Against Whistleblowers: Should Counterclaims Against* Qui Tam *Plaintiffs be Allowed in False Claims Act Cases?*, 62 U. Cin. L. Rev. 713, 727–28 (1993); Valerie R. Park, Note, *The False Claims Act,* Qui Tam *Relators, and the Government: Which is the Real Party to the Action?*, 43 Stan. L. Rev. 1061, 1064 (1991) ("As the American system of government developed, government agencies became more effective, as did conventional law enforcement procedures. This diminished the need for *qui tam*.") (internal citations omitted).

**20.** *See* Park, *supra* note 19, at 1064 (citing Robert W. Fisher, Jr., Qui Tam *Actions: The Role of the Private Citizen in Law Enforcement*, 20 UCLA L.Rev. 778, 779–780 (1973)).

**21.** *See* Strader, *supra* note 19, at 728 n. 86 (noting that, prior to the Civil War, "[t]hese restrictions included: short statutes of limitations; strict venue statutes; penalties for wrong-doing informers; requiring informers to pay costs if they did not prevail; giving states exclusive control of penal actions; labeling suits as criminal instead of civil; and eliminating monetary awards to the *qui tam* plaintiffs"); Park, *supra* note 19, at 1064.

**22.** 31 U.S.C. §§ 3729–3733 (1994). *See* Anna Mae Walsh Burke, Qui Tam: *Blowing the Whistle for Uncle Sam*, 21 Nova L.Rev. 869, 871 (1997); Strader, *supra* note 19, at 728–29; Park, *supra* note 19, at 1066.

**23.** *See* James B. Helmer, Jr. & Robert C. Neff, Jr., *War Stories: A History of* Qui Tam *Provisions of the False Claims Act, The 1986 Amendments to the False Claims Act, and Their Application in the* United States ex. rel

times referred to as "Lincoln's law,"[24] the FCA allowed private citizens to file civil actions against any party who had presented a false claim for payment to the United States government and rewarded *qui tam* relators fifty percent of the recovered money.[25]

With the end of the Civil War, military suppliers faded somewhat from public scrutiny and *qui tam* actions once again fell under attack. In particular, critics focused on the fact that government employees who simply combed public records, instead of offering original information, could bring *qui tam* actions.[26] When the Supreme Court eventually legitimated this practice in *United States ex. rel. Marcus v. Hess*,[27] Congress immediately responded by debating whether the FCA should require the relator to be an original source of at least some of the information underlying the *qui tam* suit;[28] additionally, the

resulting amendments reduced the size of the reward that may be given to the relator[29] and, for the first time, permitted the government to intervene in such suits.[30]

The practical effect of the 1943 debates and amendments upon *qui tam* suits was, in the words of one commentator, to create an "ice age."[31] The changes discouraged *qui tam* actions to such a degree that, in 1986, Congress decided once again to widen the path for the *qui tam* relator. Particularly galvanizing Congress was a burgeoning federal deficit and a fear that defense contractors and others were—to hum an old tune—swindling the government.[32] The 1986 liberalization increased the reward available to *qui tam* relators[33] and permitted more of the public record to be a source of the information.[34]

Since the 1986 amendments, *qui tam* suits have seen a second rebirth. Statis-

Gravitt v. General Electric Co. *Litigation*, 18 Ohio N.U. L.Rev 35, 35 (1991) (citing 132 Cong. Rec. H6482 (daily ed. Sept 9, 1986) (statement of Rep. Berman)).

**24.** *See* Burke, *supra* note 22, at 872; Evan Caminker, Comment, *The Constitutionality of* Qui Tam *Actions*, 99 Yale L.J. 341, 387 (1989).

**25.** *See* Act of March 2, 1863, ch. 67, 12 Stat. 696 (1863) (codified as amended at 31 U.S.C. §§ 3729–3731 (1994)).

**26.** *See* Burke, *supra* note 22, at 872.

**27.** 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943).

**28.** *See* S.Rep. No. 99–345, at 12 (1985), *reprinted in* 1985 U.S.C.C.A.N. 5266, 5277 ("The [1943] Senate specifically provided that jurisdiction would be barred on *qui tam* suits based on information in the possession of the government unless the relator was the original source of that information. Without explanation, the resulting conference report dropped the clause regarding original sources of allegations."); *see also* Burke, *supra* note 22, at 872 (discussing this legislative history).

**29.** *See* Act of Dec. 23, 1943, ch. 377, 57 Stat. 608 (1943) (codified as amended at 31 U.S.C. § 3730(d) (1994)).

**30.** *See id.*

**31.** *See* Park, *supra* note 19, at 1066.

**32.** *See id.* (citing, *inter alia*, S.Rep. No. 99–345, at 1–8 (1985), *reprinted in* 1985 U.S.C.C.A.N. 5266, 5266–73.). Apparently, "[s]ome things never change: Today, perhaps ten percent of the Federal budget [amounting to upwards of $100 billion] is being lost each year due to fraud against the taxpayers, and there are indications of massive procurement abuses occurring in the recent military budget." Caminker, *supra* note 24, at 349 (internal quotation marks omitted); *see also* Strader, *supra* note 19, at 713 n. 1 (relying on statements made by the Department of Justice to reach the same conclusion).

**33.** *See* 31 U.S.C. § 3730(d)(2); *see also* Park, *supra* note 19, at 1067 (discussing this change).

**34.** *See* 31 U.S.C. § 3730(e)(4); *see also* Burke, *supra* note 22, at 873 (discussing this alteration). Congress's actions in liberalizing the *qui tam* laws occurred first in the False Claims Amendments Act of 1986, Pub.L. No. 99–562, 100 Stat. 3153 (codified at 31 U.S.C. §§ 3730 (1994)). Two years later, with the Major Fraud Act of 1988, Pub.L. No. 100–700, 100 Stat. 4631, 4638 (codified at 31 U.S.C. § 3730 (1994)), Congress again amended the FCA, this time to confront the issue of *qui tam* relators who themselves commit fraud against the government.

tics illustrate the difference the amendments made. Whereas 33 *qui tam* suits were filed in 1987, 274 such suits were filed in 1995.[35] Moreover, the total recovery generated by *qui tam* statutes has jumped, from a paltry $2 million in 1988, to a remarkable $243 million in 1995.[36] Indeed, since 1987, the FCA's *qui tam* provisions resulted in a recovery of more than a billion dollars.[37] Consequently, in evaluating *qui tam*'s place in history, I cannot overlook the boon to the federal Treasury occasioned by such statutes. Indeed, "[q]ui tam, or standing in the shoes of the king, is an old occupation but never before has it been so profitable."[38]

### C

The majority's conclusion that *qui tam* has not become "part of the fabric of our society"[39] is, quite plainly, troublesome. Even assuming that finding the provision to be part of that "fabric" were necessary, which it is not, *see supra* Part I.A., the

history of *qui tam* actions is indisputably an ancient one;[40] not only were they an important part of the legal tradition brought to America during the colonial period, but *qui tam* provisions were also in place when the legal machinery of our modern government was in its nascent phases. Indeed, even the Supreme Court has recognized the historical importance of *qui tam*.[41]

The majority counters this evidence by concluding summarily, ante at 519–20, that, since Congress has reduced the number of *qui tam* statutes over the lifetime of this nation, such provisions do not have support in history. As I have illustrated above, however, both Parliament and Congress after it typically enacted *qui tam* statutes when the government's legal processes required bolstering; such statutes inevitably become less necessary as the government's internal law enforcement mechanisms strengthen. Consequently, the fact that the FCA contains the primary

---

**35.** *See* Burke, *supra* note 22, at 870.

**36.** *See id.* at 871.

**37.** *See id.*

**38.** 3 WILLIAM BLACKSTONE, COMMENTARIES *160.

**39.** *Marsh v. Chambers*, 463 U.S. 783, 792, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983).

**40.** In *Marsh*, the majority's primary conduit for its "fabric of society" argument, the Supreme Court compared practices "carefully considered by the Framers," ante at 519 n. 10, with those "taken thoughtlessly, by force of long tradition." 463 U.S. at 791, 103 S.Ct. 3330. No serious argument, advanced by the majority or within my ken, supports the implication that the *qui tam* provisions were enacted "thoughtlessly."

In addition, I admit that I am somewhat nonplussed by the majority's choice of the bracketed alteration "constitutional" in its citation to *Marsh*, ante at 519 n. 10. In fact, the full quotation reads "taken thoughtlessly, by force of long tradition and without regard to the problems posed by a pluralistic society." *Id.* at 791, 103 S.Ct. 3330. The Court's use of "pluralistic society," as it explains in the sentences immediately following, referenced the multitude of religious beliefs held

by the Framers. *See id.* at 791–92, 103 S.Ct. 3330. The Court was not speaking to the Establishment Clause question in this portion of its opinion; it was only noting that the vigorous debates accompanying the enactment of certain statutes lent credence to them, a circumstance which the majority does not prove was lacking with the adoption of the *qui tam* statutes.

**41.** *See Marvin v. Trout*, 199 U.S. 212, 225, 26 S.Ct. 31, 50 L.Ed. 157 (1905) ("Statutes providing for actions by a common informer, who himself had no interest in the controversy other than that given by the statute, have been in existence for hundreds of years in England, and in this country since the foundation of the Government."). In *United States ex rel. Marcus v. Hess*, the Third Circuit's decision began with the premise "that *qui tam* or informer actions have always been regarded with disfavor." *United States ex rel. Marcus v. Hess*, 127 F.2d 233, 235 (3rd Cir.), *rev'd*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943). In reversing the lower court, Justice Black wrote that "[w]e cannot accept either the interpretative approach or the actual decision of the court below. *Qui tam* suits have been frequently permitted by legislative action and have not been without defense by the courts." *Marcus*, 317 U.S. at 541, 63 S.Ct. 379.

*qui tam* provisions in use today does not undermine the "unambiguous and unbroken history" of such suits. Congress has frequently resorted to *qui tam* statutes as needed; the majority's suggestion that *qui tam* statutes are old-fashioned, *see* ante at 519–20, only enhances this observation.[42] While the number of such statutes has waxed and waned, a *qui tam* statute has been on the books almost every day for the past 200 years.

In sum, the history of *qui tam* provisions should guide our understanding of their relationship to the constitutional proscriptions of the Take Care Clause. Although history should never be perceived as a dispositive source of constitutional guidance, it is certainly persuasive authority that the drafters of the Take Care Clause considered the Clause to be in harmony with the many *qui tam* statutes that they and their successors enacted. With this understanding of *qui tam*'s history firmly in mind, I now turn to the merits of the constitutional question. In Part II of the opinion, I address the majority's contention that the *qui tam* provisions violate the separation of powers principles embodied in the Take Care Clause. In Part III, I suggest a different, more compelling, approach to the separation of powers question presented by these provisions. Part IV of the opinion examines the various historical justifications for the separation of powers and explains how the *qui tam* relator provisions pass muster under any of them. Finally, Part V concerns persuasive authority from a sister circuit.

## II

The majority holds that the *qui tam* provisions violate separation of powers doctrine by running afoul of the Take Care Clause of Article II. Amazingly, however, my colleagues cannot point to a single analogous case in which the Supreme Court has found that an enactment of Congress violates separation of powers. Instead, the majority makes recourse to three decisions, *Commodity Futures Trading Comm'n v. Schor*,[43] *Nixon v. Administrator of Gen. Servs.*,[44] and *Morrison v. Olson*,[45] each of which rejected separation of powers challenges to legislative enactments, and attempts to distinguish each from the case at bar. I believe their effort fails, and in this Part of my opinion, I will address why each case actually supports the conclusion that the *qui tam* provisions do not violate separation of powers.

While the majority correctly states the principle that "[t]he doctrine of separation of powers prohibits one branch of government from intruding on the constitutionally granted powers of another," ante at 523, it never persuasively explains how the provisions at issue in the case *sub judice* so intrude. Instead, it makes passing reference to Congress's having "stripped the Executive Branch of some of its power," ante at 523, and then moves on to consider, ante at 524, "the separation of powers problem that is raised when an act of Congress impinges on the Executive Branch's 'take care' duties."

The *qui tam* relator provisions do not violate separation of powers because they

---

**42.** Moreover, the fact that criticism has been leveled at *qui tam* statutes throughout their history should not affect our constitutional analysis. The proper place to debate the *merits* of a law is Congress; the judiciary's role in this exercise is simply to decide whether the framers, in drafting the Take Care Clause, meant to exclude *qui tam* statutes as one of the potential mechanisms by which to enforce the law. As a sister circuit sagely observed, "Congress has let loose a posse of ad hoc deputies to uncover and prosecute frauds against the government. States and state agencies ... may prefer the dignity of being

chased by the regular troops; if so, they must seek relief from Congress." *United States ex rel. Milam v. Univ. of Texas M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 49 (4th Cir.1992).

**43.** 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986).

**44.** 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977).

**45.** 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988).

neither "impermissibly undermine[ ]"[46] the executive's power nor "prevent the Executive from accomplishing its constitutionally assigned functions."[47] In *Schor*, the Supreme Court rejected a constitutional challenge to Congress's empowerment of the CFTC to entertain state law counterclaims in reparation proceedings, finding that the grant of such authority did not violate Article III.[48] The majority's best effort at reconciling this case, which opened the door to a variety of non-Article III adjudications, is implicitly to criticize the Court for not enunciating the dividing line between "permissible" and "impermissible" legislative action. Ante at 524. This back-door distinction is unavailing because the Court found the statute to be a *permissible* intrusion not subject to a separation of powers attack.

*Schor* built upon *Nixon*, in which the Court similarly rejected a separation of powers challenge to Congress's direction to an Executive Branch official—the Administrator of General Services—to take custody of President Nixon's presidential papers and tape recordings for the purpose of archiving. The Court held that the limited screening undertaken by the archivists did not violate the President's expectation of confidentiality and privacy and thus did not constitute anything other than "a very limited intrusion" into the domain of the Executive Branch.[49] Again, the majority's discussion of this case amounts to a criticism that the Court "did not explain what degree of congressional interference is necessary before the 'proper balance' [between the coordinate branches] has been disrupted." Ante at 524. It is not, of course, unusual for the Court to eschew paragraphs of dicta describing what might have constituted a violation when its decision holds an act constitutional. *Schor* and

*Nixon* provide, in my view, a cache of support for the proposition that legislative enactments enjoy a certain presumption of constitutionality in this area.

This point is hammered home, none too subtly, by the crown jewel of the majority's opinion. In *Morrison*, the Court upheld the constitutionality of the independent counsel provisions of the Ethics in Government Act.[50] My colleagues gamely attempt to distinguish this case by discussing, ante at 526–28, the safeguards mentioned in *Morrison* and then positing that the *qui tam* relator provisions fail to satisfy the *Morrison* Court's concerns. While the majority attempts to find its target simply by attacking the *qui tam* provisions point-by-point under *Morrison*'s test, the fact remains that *Morrison* represents the zenith of the Court's permissive approach to separation of powers concerns, neither the "outer limits" of that jurisprudence nor the ingress for the separation of powers attack envisioned by the majority.

Indeed, the majority's only two significant efforts to rationalize *Morrison*'s imprimatur of Congress's action bear out the difficulty in the majority's position. First, my colleagues announce—with no support other than caprice—that "[t]he independent counsel provisions of the [Ethics in Government Act] likely represent the outer limits of congressional encroachment on another branch's powers and functions." Ante at 547 n. 32. The majority then opines that the Supreme Court only upheld the independent counsel statute because it viewed the "device's encroachment on executive powers as an evil that had to be incurred to provide some accountability within the Executive Branch." *Id.* Nowhere in the Court's lengthy, 7–1 opinion,

46. *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 856, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986).

47. *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 443, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977).

48. *Schor*, 478 U.S. at 857, 106 S.Ct. 3245.

49. *Nixon*, 433 U.S. at 451, 97 S.Ct. 2777.

50. *Morrison v. Olson*, 487 U.S. 654, 696, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988).

authored by the Chief Justice, does it suggest that the statute represented "an evil," that the justification for the law "was unique," or that the holding in *Morrison* represented "the outer boundary" in the Court's separation of powers jurisprudence.

The majority also arrives at the spurious conclusion that, since the independent counsel statute was designed to address "a narrow structural problem" within the Executive Branch, it could not be an impermissible intrusion on Executive authority. Ante at 529. The majority's conclusory support for this statement is that the statute was "narrowly tailored" because it authorized an independent counsel only in limited circumstances. *Id.; see also* ante at 547 n. 32. With all due respect, I believe that if an action of one branch violates separation of powers, it violates separation of powers. The fact that a structural problem may have existed within the Executive Branch did not give Congress authority *under this doctrine ipso facto* to intrude on the Executive Branch's province, just as even the narrowest statute would not avoid violating the principle

in the face of the strict construction that the majority gives the term "separation of powers."

Read in the light of these three cases, each of which upheld a statute against a separation of powers challenge, it is apparent that, far from undermining the executive's power in any constitutional sense, the *qui tam* provisions serve exactly the opposite role. Before any *qui tam* action may proceed, the relator must serve on the government the complaint and a written disclosure, and the Attorney General must then choose whether to "intervene and proceed with the action,"[51] or to allow the relator "to conduct the action."[52] If the Attorney General decides to intervene, the government has "primary responsibility for prosecuting the action."[53]

A fourth case cited by the majority, *Printz v. United States*,[54] is the only opinion relied upon by my colleagues that actually held an act unconstitutional. The *Printz* Court, however, rested its decision not on separation of powers doctrine but upon notions of federalism incorporated in the Constitution.[55] The *Printz* Court not-

---

**51.** 31 U.S.C. § 3730(b)(2).

**52.** *Id.* § 3730(b)(4)(B).

**53.** *Id.* § 3730(c)(1). The majority implies, ante at 517–18 that the fact that the relator still participates in an action in which the government intervenes and shares in any damages awarded the government somehow undermines the Executive's authority. *Cf. infra* note 78 (discussing the majority's disingenuous treatment of cases in which the Executive chooses to intervene). How the relator's participation undermines authority is an opaque concept indeed; the relator's knowledge of events and, presumably, of the litigants, would seem to benefit the government's prosecution of the case. In addition, the statute's provision, *see* § 3730(d)(1), that the relator share in the damage award does not implicate separation of powers concerns; rather, it serves as a reward to a citizen who brings to light a violation of federal law that would otherwise likely escape detection and then devotes a portion of his or her life (likely several years) to bringing the perpetrators to justice.

Other statutes that create a private right of action function in similar, albeit not identical,

ways. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (1994), for example, allows a private citizen to initiate a suit on her own behalf, against a private entity, in order to enforce federal law. While such an action is not *on behalf of* the United States, as is a *qui tam* action, the principle—that a private citizen may enforce federal law—is the same. *Cf.* Caminker, *supra* note 24, at 344 (noting that *qui tam* statutes and citizen-suit statutes "serve the same purpose: [b]oth are designed to encourage private citizens to help the executive branch deter and redress violations of Federal law.").

**54.** 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997).

**55.** *See id.* at 935, 117 S.Ct. 2365 ("The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program."). In the course of its opinion striking down the law on federalism grounds, the Court does address federal separation of powers, *see id.* at 922–23, 117 S.Ct. 2365, as the

ed that the Brady Act transferred the responsibility of administering a federal law to state law enforcement officers who were "to implement the program without meaningful Presidential control."[56] Here, of course, Congress has not shifted to *qui tam* relators the requirement to administer the laws; indeed, *contra Printz*, after the filing of the action the Executive at all times retains discretion with respect to the FCA claim. Congress has not removed from the Attorney General her power to enforce the law, as the Supreme Court found that the Brady Act did. Instead, Congress has arguably made the Attorney General's job easier by deputizing private citizens who may bring to the attention of the Executive Branch potential violations of law.

In a situation such as that presented by the case at bar, where the Attorney General decides not to intervene in the action, it is true that the relator has the authority to prosecute a claim on behalf of the United States. *See* ante at 517–18. Unlike the majority, however, I do not assign apocalyptic weight to this event. Instead, I submit that, when the government declines to intervene in a *qui tam* action, it has delegated *its own* law enforcement authority;[57] Congress has not usurped it at all, much less for its own uses.[58] Simply stated, the *qui tam* relator provisions do not violate separation of powers principles.

### III

In my view, the *qui tam* provisions are constitutional for an additional reason. Congress, with the approval of the President,[59] may delegate power—legislative, executive, and judicial—to administrative agencies.[60] Similarly, the President may delegate executive power to entities independent of any formal branch of government.[61] In *Humphrey's Executor v. Unit-*

majority notes, ante at 523, but it most assuredly does not base its conclusion there. *See id.* at 905, 117 S.Ct. 2365 (mapping the opinion's course down the three channels necessary to reach its result: "historical understanding and practice, [the] structure of the Constitution, and [the] jurisprudence of this Court"); *cf. supra* note 6 (noting the importance of history to constitutional questions where the document itself is silent). Instead, *Printz* is more appropriately viewed as a companion to *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), wherein the Court held that Congress cannot compel a state to enact or to enforce a regulatory program. *See* 505 U.S. at 166, 112 S.Ct. 2408.

56. *Id.* at 922, 117 S.Ct. 2365.

57. *See infra* Part IV.

58. The majority criticizes this conclusion, ante at 524 n. 29, apparently assigning to this dissent the untenable position that only "aggrandizement" of power by one branch at the expense of another may constitute a separation of powers violation. One branch may indeed "impermissibly undermine" the constitutionally-assigned powers of another without aggrandizing its own power, *see Clinton v. Jones*, 520 U.S. 681, 701, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997), but finding that sort of constitutional violation requires more guesswork than the concededly more obvious at-tempt to aggrandize. The type of action that constitutes "impermissbl[e] undermin[ing]" is open to a great deal more interpretation, as this case demonstrates.

Therefore, that Congress did not authorize an aggrandizement of its own power at best is persuasive authority for the notion that the statute is constitutional; it is neither intended as a dispositive, nor a myopic, observation.

59. The majority misinterprets the delegation question that I address *infra*. It is beyond peradventure that "Congress may not delegate purely executive power without the acquiescence of the Executive." Ante at 530. I agree whole-heartedly with that proposition and discuss here instance of delegation in which the Executive has concurred. For the reasons that follow, I believe that the *qui tam* relator provisions at issue in this case exemplify a delegation of Executive power to which the Executive has acquiesced.

60. *See generally,* R. Kevin Bailey, Note, *"Did I Miss Anything?": Excising the National Security Council from FOIA Coverage*, 46 Duke L.J. 1475, 1493 n. 101 (1997) (discussing at length the history of the delegation of legislative power to independent agencies).

61. *See Humphrey's Executor v. United States*, 295 U.S. 602, 627, 628, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) (holding that the President, hav-

*ed States*, a case cited by the majority, ante at 523 n. 27, for the boilerplate proposition that each branch must remain "free from the control or coercive influence" of the other,[62] a unanimous Supreme Court actually *restrained* the President from exercising his constitutionally-bestowed executive authority to remove an officer of the United States because he had previously delegated his authority to that official, who then became independent of Executive Branch control.[63] The Court observed, in sweeping language, that the NLRB was "independent of executive authority" and "free to exercise its judgment without the leave or hindrance of any other official or any department of the government."[64]

This seminal decision, of course, abetted the rise of independent agencies by overcoming the nondelegation doctrine, a theory of some currency in the 1930's which provided that Congress could not cede its power to another branch of government or to an independent party:[65] During the New Deal, the Supreme Court held two statutes unconstitutional under the nondelegation doctrine, opining that, in the absence of an "intelligible principle" for the exercise of delegated power,[66] such an act was surely unconstitutional.[67]

Since 1935, the Supreme Court has stamped every delegation of authority, both legislative and executive, with the

---

ing ceded his authority in a particular area to an independent agency, may not attempt to exercise control over the actions of such an agency, even though it would not have existed but for the delegation of power). *Cf. Myers v. United States*, 272 U.S. 52, 134, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (providing that the President exercises "unrestricted power" in directing the actions to be taken by his executive subordinates).

62. *Id.* at 629–30, 55 S.Ct. 869.

63. *See id.* at 631–32, 55 S.Ct. 869.

64. *Id.* at 625–26, 55 S.Ct. 869; *see also Morrison v. Olson*, 487 U.S. 654, 659–60, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (holding that a statutory scheme designed to protect independent agency officials from executive control is constitutional).

65. *See* STONE ET AL., *supra* note 9, at 416.

66. Strictly speaking, as I have indicated, the nondelegation doctrine referred only to delegations of legislative power to the executive. Nevertheless, the rationale behind the doctrine applies with equal force to judicial and executive delegations as well. *See, e.g., Mistretta v. United States*, 488 U.S. 361, 371, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (holding that the power to promulgate sentences was not improperly delegated to an independent Sentencing Commission); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 857, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (holding that the CFTC's adjudicative functions did not violate separation of powers); *Crowell v. Benson*, 285 U.S. 22, 46, 50, 52 S.Ct. 285, 76 L.Ed. 598 (1932) (allowing delegation of judi-

cial power to Employees' Compensation Commission under the theory that it adjudicated "private rights" only); *Murray v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 275, 15 L.Ed. 372 (1855) (reasoning that, because the government can only be sued with its permission, Congress can establish the terms and conditions of such litigation, including that the matter be resolved by a non-Article III adjudicator).

67. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 541–42, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) (declaring the National Industrial Recovery Act's ("NIRA") "fair competition" provisions invalid because they supplied the President with "virtually unfettered" control over trade and industry); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 432–33, 55 S.Ct. 241, 79 L.Ed. 446 (1935) (holding unconstitutional an NIRA provision that delegated power to the President without providing an intelligible principle for its exercise).

The "intelligible principle" test itself was developed a few years earlier in *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928). In that case, the Supreme Court considered a delegation by Congress, authorizing the President to revise certain tariffs whenever he determined revision to be necessary, to "equalize the said differences in costs of production in the United States and the principal competing country." 276 U.S. at 401, 48 S.Ct. 348. The Court approved the delegation because Congress had established an "intelligible principle" by which the justices could determine whether the President had acted within his delegated authority. *See id.* at 409, 48 S.Ct. 348. Significantly, then the "intelligible prin-

imprimatur of constitutionality, always finding that seemingly-ineluctable "intelligible principle."[68] Indeed, "[i]n recent years, [the Supreme Court's] application of the nondelegation doctrine principally has been limited to the interpretation of statutory texts, and, more particularly, to giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional."[69] In any event, all agree that Presidential control and supervision over the decisions of independent officers is limited;[70] similarly, a finding that executive control over *qui tam* relators is, to some degree, limited would not offend separation of powers doctrine or whatever principles of nondelegation remain viable because relators, while not independent "agencies," receive their authority through the conjunctive action of Congress and the President through the operation of an intelligible principle, namely, the ability of the Executive to intervene in any *qui tam* suit.

In one of the latest challenges to an act of Congress charging a violation of the nondelegation doctrine, the unanimous Supreme Court, in *Touby v. United States*,[71] upheld the constitutionality of § 201(h) of the Controlled Substances Act of 1970.[72] The Act authorizes the Attorney General to schedule as a "controlled substance" any drug that he or she has found to meet certain statutory criteria relating, *inter alia*, to a "history and current pattern of abuse" and constituting a risk to the public health. If the drug is scheduled, its manufacture, possession, or distribution becomes a criminal offense.

The Court rejected the petitioner's contention that the statute concentrates too much power in the hands of the Attorney General by allowing her to define the very crimes that she then has the responsibility to prosecute.

This argument has no basis in our separation-of-powers jurisprudence. The principle of separation of powers focuses on the distribution of powers *among* the three coequal Branches; it does not speak to the manner in which authority is parceled out within a single Branch ... Petitioners' argument that temporary scheduling authority should have been vested in one executive officer rather than another does not implicate separation-of-powers concerns; it merely challenges the wisdom of a legitimate policy judgment made by Congress.[73]

Although *Touby* addressed delegation by Congress to the Executive Branch rather than by the Executive to citizen relators, the principle enunciated—that Congress's legitimate policy decisions do not implicate separation of powers concerns, should inform our decision here. In the case at bar, the FCA provides the Executive Branch the option of delegating its authority; once done, the ability of the Executive

---

ciple" formulation permits the delegation of discretion.

**68.** The Court has also found some delegations to be constitutional where they collaterally implicate aspects of legislative, executive, and/or judicial power. *See, e.g., Wiener v. United States*, 357 U.S. 349, 356, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958) (holding that the adjudicatory nature of the War Claims Commission implicitly limited the President's power to remove its officials, despite the fact that the President had appointed them).

**69.** *Mistretta*, 488 U.S. at 373 n. 7, 109 S.Ct. 647. For an example of such an application, see *Industrial Union Dep't v. American Petroleum Institute*, 448 U.S. 607, 646, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (announcing the rule that "[a] construction of [a] statute that avoids [an] open-ended grant [of delegated power] should certainly be favored.").

**70.** *See, e.g.,* Cass R. Sunstein, *Constitutionalism after the New Deal*, 101 Harv. L.Rev. 421, 444 (1987) ("[T]he power of the President to control regulatory agencies was frequently limited by law or in practice[,]" even as the President's power otherwise increased during the New Deal period).

**71.** 500 U.S. 160, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991).

**72.** 21 U.S.C. § 811(h) (1988).

**73.** 500 U.S. at 167–68, 111 S.Ct. 1752 (citation omitted) (emphasis added).

to control the litigation whose course it has left to the relator does not implicate separation of powers principles,[74] just as the wisdom of a particular delegation does not present a justiciable issue.[75]

The majority does not address the delegation issue presented by this case; instead, my colleagues skirt a discussion of this fundamental, accepted practice by dwelling on what they take to be the great teaching of *Morrison v. Olson:* that one branch—in this case, Congress—cannot take power away from another without leaving sufficient "control" of the exercise of that power in the hands of the branch which constitutionally manages it.[76] *See* ante at 525. I take no issue with the majority's point here: Congress surely may not take so much power away from the Executive Branch that its authority in a law-enforcement area is undermined. I

respectfully note, however, that, even under the *qui tam* relator statute, the President still ultimately retains substantial control over the Executive Branch's litigative functions. As such, the case before us is more appropriately viewed as one concerning the delegation of powers and the evisceration of the nondelegation doctrine.

Accordingly, the majority's concern with the *qui tam* relator provision's violation of the Take Care Clause should not carry the day. Just as the Executive may delegate some of its power to an independent party, traditional principles of prosecutorial discretion allow executive officials some leniency in deciding when and how to enforce the law.[77] The majority contends, ante at 525, that the *qui tam* provisions constrain prosecutorial discretion by allowing a private citizen to sue on behalf of the government even when the Attorney Gen-

---

**74.** *See Humphrey's Executor,* 295 U.S. at 631–32, 55 S.Ct. 869.

**75.** *See Touby,* 500 U.S. at 168, 111 S.Ct. 1752.

**76.** My colleagues note that other circuits passing on the constitutionality of the FCA's *qui tam* provisions have deferred to *Morrison*'s "control" test. *See* ante at 525 & n. 31. As I explained *supra,* I do not dispute that *Morrison* is a partial answer to the question presented by the *qui tam* provisions; I simply believe that it is an incomplete response in light of the Executive Branch's ability to delegate its powers to an independent party, in this case the *qui tam* relator. The independent counsel cannot be considered an "independent" party in the same way, primarily because the Executive Branch itself—through the Attorney General—must in *every* case involving potential wrongdoing within the Executive Branch determine whether an independent counsel is needed. To borrow a metaphor from classical mythology, Athena, in the person of the independent counsel, springs from Zeus's head and becomes a stubborn maverick. The *qui tam* statute works in exactly the opposite way: the relator brings the case to the attention of the Executive, who then chooses whether or not to let the relator proceed with the action on her own or to take over the litigation itself. At no point must the Executive determine whether to *appoint* a relator to undertake the Executive's investigatory functions. The majority concludes that this factor makes

the *qui tam* relator provision *more* restrictive than the independent counsel law. *See* ante at 529 ("[T]he controls the Executive Branch may exercise . . . are simply not sufficient to counterbalance this major encroachment on Executive power."). I disagree because the independent counsel statute *requires* the appointment of an independent counsel unless there are "no reasonable grounds to believe that further investigation is warranted;" in that sense, the Executive has *less* control than in the instant scenario. By contrast, the *qui tam* statute *never* requires even the government's acquiescence in a case, much less an actual appointment.

I believe that *Morrison*'s "control" test does not invalidate the *qui tam* relator provisions. While politics might on some level impact the Executive's decision to intervene in a particular case, it is in all cases the Executive Branch itself that determines how much control it will have over a *qui tam* action, not Congress. It is beyond peradventure that Congress would ever exercise "control" over a *qui tam* action in the same fashion that it politically may attempt to control the Executive's implementation of the independent counsel statute.

**77.** *Cf. Heckler v. Chaney,* 470 U.S. 821, 835, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (concluding that the Executive's exercise of prosecutorial discretion does not violate the Take Care clause).

eral decides not to pursue the claim.[78] The path to this conclusion is a tortuous one at best; in my view, when the Attorney General decides not to pursue the claim, she has delegated to the relator the prosecutorial authority and discretion that are normally incumbent upon the Executive Branch. The discretion itself has not been eliminated.[79]

The fallacy of the majority's argument is best illustrated by its effort, ante at 525–26, to describe how *qui tam* actions in which the government does not intervene, such as the instant case, nonetheless "encroach on the Executive's authority to initiate litigation aimed solely at redressing the government's injuries." The majority contends that, since prosecutorial discretion includes "the power to decide whether to bring suit," allowing the relator initially to file the suit somehow undermines the discretion. *See also* ante at 525–26 (chronicling as particularly important the Attorney General's decision whether to bring suit). While I would agree that bringing suit is a part of prosecutorial discretion, both in the civil and criminal contexts, I fail to see how the fact of the government's choosing not to prosecute itself when the relator wishes to do so is in any way akin to allowing a third party to bring suit in the government's name *over the government's objection*, which is the situation that the majority implies exists here. To the contrary, there may be many reasons why the government does not intervene: lack of manpower or other resources, disinclination to perform the necessary investigation about a particular offender, small amount of money at stake, doubts about the ability of the suit to succeed. Regardless of the situation, however, the government has not objected to the suit. Indeed, the government only *stands to benefit* from the suit's progress; if the relator loses a suit in which the government chose not to intervene, then the so-called loss of prosecutorial discretion is moot since the Attorney General could have prosecuted the case herself; if the relator wins, the Treasury recovers funds.

In addition, and perhaps most tellingly, the relator may not dismiss the suit voluntarily unless the Attorney General consents to such action.[80] The majority attempts to bury this significant information in a footnote, ante at 517 n. 5, but it is a decisive point. The government has discretion over the suit from the moment that the relator brings the facts to the Attorney General's attention; the government may intervene or not, but the suit cannot simply be dismissed on the whim of the relator if the government believes it to be meritorious. This is a crucial distinction from the hypothetical statute that strips

---

**78.** Of course, the majority also notes, ante at 528 n. 39, that "this concern about encroachment on the Executive's prosecutorial discretion is present only in *qui tam* actions in which the government declines to intervene." While I agree in principle with this statement, the text of the majority's opinion does not always maintain a firm grip on this moderating observation. In the preceding paragraphs, the majority attacked the *qui tam* provisions for interfering with the Executive Branch's "ability to control the litigation," ante at 525–26, even where the Attorney General elected to intervene. In my view, this vacillation is a fatal flaw in the majority's argument: if losing control over litigation does not represent a violation of the separation of powers doctrine, then neither does the Executive's decision to delegate its prosecution of a case to a third party.

**79.** The majority adverts to *Chaney* and to *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), but those cases actually undermine the majority's position. *Nixon* in particular recognized the principle of "absolute discretion" in the Executive Branch's role as prosecutor. 418 U.S. at 693, 94 S.Ct. 3090. As I have stated earlier, the *qui tam* provisions do not eliminate that discretion, for the Attorney General may elect to intervene to prosecute the case herself, or she may request that the district court dismiss the case. *See* 31 U.S.C. § 3730(c)(2)(A). When she does neither, she has not lost power, as the majority suggests; she has simply passed the mantle of her power on to the relator.

**80.** *See* 31 U.S.C. § 3730(b)(1); *Searcy v. Philips Electronics N. Am. Corp.,* 117 F.3d 154, 159 (5th Cir.1997).

the Attorney General of all discretion and allows a relator to proceed willy-nilly through the court system; the *qui tam* relator provisions of the FCA on the contrary require a more measured approach. At all times after the filing of the action onward, the government takes the lead, to the degree it desires, in the prosecution of the case.

## IV

The separation of powers concern raised by the majority is a phantom one for another reason as well. Although the majority does not even pause to address the underpinnings of the separation of powers doctrine, the motivations of the Founders in fashioning a tripartite government offer helpful insight into this case. Throughout our history, constitutional pundits have held that the distribution of national powers—commonly referred to as "separation of powers" or "checks and balances"— serves either of two distinct purposes. The first justification for our constitutional structure is rooted in principles of efficiency. According to this view, "a division of labor among the various branches makes government more efficient, especially because of the concentration of executive power in the President, who can act with dispatch."[81] An alternative, and at times even concomitant, rationale justifies the separation of powers as necessary to prevent tyranny. Adherents of this view argue that the system of checks and balances "diffuses governmental power, diminishing the likelihood that any one branch will be able to use its power against the citizenry."[82] Neither rubric, nor any other that the majority may have putatively advanced, explains why the *qui tam* relator provisions of the FCA violate the constitutional separation of powers as expressed in the Take Care Clause.

### A

The logic of the efficiency argument is that, following the disastrous ascendancy of the Articles of Confederation, the Framers of the Constitution sought to create a strong, energetic Executive who would preside over a government whose duties were sensibly divided between its three branches.[83] Support for this view extends to the Constitutional Convention:

> Efficiency was stressed as a principal reason for establishing an executive independent from the legislature by, among others, John Adams, Thomas Jefferson, John Jay, and James Wilson.... [Wilson's] views are particularly apposite:
>
> > ... [I]n the active scenes of government, there are emergencies, in which the man ... who deliberates, is lost. But, can either secrecy or dispatch be expected, when, to every enterprise, mutual communication, mutual consultation, and mutual agreement among men, perhaps of discordant views, of discordant tempers and of discordant interests, are indispensably necessary? ... If, on the other hand, the executive power of government is placed in the hands of one person, is there not reason to expect, in his plans and conduct, promptitude, activity, firmness, consistency, and energy?
>
> ...
>
> Despite the assertions to the contrary, the efficiency version has been dominant throughout American constitutional history. Separation of powers has never been a barrier to a high level of cooperation between the political branches of government—a situation that, speaking generally, has found judicial acceptance....[84]

81. STONE ET AL., *supra* note 9, at 362–63.

82. *Id.* at 363.

83. *See id.*

84. Arthur Selwyn Miller, *An Inquiry into the Relevance of the Intentions of the Founding Fathers, with Special Emphasis upon the Doctrine of Separation of Powers*, 27 ARK. L.REV. 583, 588–89 (1973).

Indeed, Alexander Hamilton defended the Constitution's expansion of executive power on the ground that such power

> is essential to the protection of the community against foreign attacks; it is not less essential to the steady administration of the laws; to the protection of property against those irregular and highhanded combinations which sometimes interrupt the ordinary course of justice; to the security of liberty against the enterprises and assaults of ambition, of faction, and of anarchy.[85]

Of course, in recent years, many theorists have come to view the separation of powers as a system consumed by its own *inefficiency*.[86] The theory here is that the powerful checks built into the constitutional structure prevent the federal government from accomplishing anything with ease; it is instead the victim of numerous stalemates.[87]

Regardless, the majority does not argue that the *qui tam* relator provisions somehow make the Executive Branch *inefficient*; if anything, the FCA provides enhanced efficiency by allowing the Executive to pick and choose which battles it will fight, rather than forcing the executive to enforce the law in every case, with no regard to whether the claim is worthy

of enjoying the weight of the government behind it.[88]

## B

Another force underlying the Take Care Clause and the separation of powers doctrine driving it is the prevention of tyranny rationale. James Madison opined that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."[89] Of the two rationales, most constitutional theorists have placed the emphasis on some form of this justification instead of the efficiency rationale. In his impassioned dissent in *Myers v. United States*,[90] for example, Justice Brandeis wrote that the "doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy."[91]

Over the course of two centuries of constitutional law, the separation of powers doctrine has admittedly been glossed

---

**85.** THE FEDERALIST No. 70, at 423 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

**86.** *See, e.g.,* THEODORE J. LOWI, THE END OF LIBERALISM: THE SECOND REPUBLIC OF THE UNITED STATES 67 (2nd ed.1980) (suggesting that the "separatist tendencies and self-defeating proclivities of the independent functions" contributes to a government with power but "without planning"); Lloyd N. Cutler & David R. Johnson, *Regulation and the Political Process*, 84 YALE L.J. 1395, 1401 (1975) (suggesting that the Constitution's "large measure of inertia against change" handicaps Congress's and the President's ability to manage the affairs of the government).

**87.** *See* STONE ET AL., *supra* note 9, at 365.

**88.** The majority, ante at 528, complains that even a *qui tam* relator who presents credible

allegations "can bind the government, via *res judicata,* and prevent it from suing over those concerns at a later date when more information is available." This concern is ethereal at best. While I concede that a hypothetical case might arise that the government deems worthy but not yet ripe, it is far likelier that, upon presentation of a valid claim, the government will assume control of the litigation than leave the case to the vagaries of the relator. Any *res judicata* concern, then, could be alleviated with recourse to a voluntary dismissal of the claim. *See* 31 U.S.C. § 3730(c)(2)(A).

**89.** THE FEDERALIST No. 47, at 301 (James Madison) (Clinton Rossiter ed., 1961).

**90.** 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926).

**91.** *Id.* at 293 (Brandeis, J., dissenting).

by other justifications for its necessity, based largely in extrapolations of the prevention of tyranny explanation. Although the majority does not suggest and I do not believe that any of these explanations mandates our finding the *qui tam* relator provision of the FCA unconstitutional, I address each briefly for the sake of thoroughness.

The separation of powers ensures the primacy of the rule of law because it provides that the power to make law is not in the hands of those who execute it. By enacting this form of constitutional government, the Legislative Branch is constrained from passing oppressive laws because they will not be exempt from their operation.[92] Such is not the concern of the *qui tam* provision, since there is no argument that Congress is *itself* usurping executive authority.

Another, more cynical, subset of the tyranny justification was the Framers' concern that government officials act not in their own interests but in the interest of the public. Consequently, if governmental power were concentrated in one branch, there would be an increased risk that that branch would act to increase the power of government at the expense of the governed. Separation of powers, under this theory, acted as a partial remedy by guarding both liberty and private property against governmental action. Indeed, if one branch tried to use its power oppressively, "[a]mbition [would] be made to counteract ambition"[93] in the form of another branch's resistance.[94] The branch thought to constitute the greatest danger in this regard was the legislative; during the operation of the Articles of Confederation, the legislature, in the view of many of the Framers, intruded impermissibly into the sphere of liberty and private property.[95]

A third justification for the constitutional distribution of powers stresses the goal of limited government. Utilizing a system of checks and balances ensures that "no law can be brought to bear against the

**92.** The primary safeguard under this view is that it

> makes the laws apply to the lawmakers. This is probably the meaning of Montesquieu's statement concerning tyrannical laws tyrannically applied; if the legislators cannot ensure a tyrannical execution, i.e., one which favors themselves, they will be less likely to make tyrannical laws for fear that they themselves will be tyrannically ruled by them. [If] a separate executive will enforce the law even against the lawmakers, the lawmakers will not have a "distinct interest from the rest of the Community."

DAVID F. EPSTEIN, THE POLITICAL THEORY OF THE FEDERALIST 129–30 (1984). *But cf.* Peter M. Shane, *Presidents, Pardons, and Prosecutors: Legal Accountability and the Separation of Powers*, 11 YALE L. & POL'Y REV. 361, 364 (1993) (arguing that "the advantages offered by checks and balances in promoting the rule of law are significant" but that "categorical separation [of powers] tends to subvert, rather than encourage executive conformity to law").

**93.** THE FEDERALIST No. 51, at 322 (James Madison) (Clinton Rossiter ed., 1961).

**94.** *See* Edward H. Levi, *Some Aspects of the Separation of Powers*, 76 COLUM. L.REV. 371, 374 (1976) (contending that the separation of powers "was based upon the skeptical idea that only the division of power among three governmental institutions—executive, legislative, and judicial—could counteract the inevitable tendency of concentrated power to overreach and threaten liberty").

**95.** *Compare* GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC, 1776–1787, at 609 (1969) (concluding that the separation of powers was intended to ensure "the protection of individual rights against all governmental encroachments, particularly by the legislature, the body which the Whigs have traditionally cherished as the people's exclusive repository of their public liberty"), *with* THE FEDERALIST No. 48, at 309 (James Madison) (Clinton Rossiter ed., 1961) ("In a democracy, where a multitude of people exercise in person the legislative functions and are continually exposed, by their incapacity for regular deliberation and concerted measures, to the ambitious intrigues of their executive magistrates, tyranny may well be apprehended, on some favorable emergency, to start up in the same quarter.").

citizenry without a broad consensus."[96]   In this respect, "there is an intimate connection between the separation of powers and the protection of private ordering."[97]   This rationale stresses a connection between the distribution of power at the national level and the desire to limit the power of democratic politics to alter the status quo.

Finally, a subset of the prevention of tyranny rationale is concerned with the problem of factions.  Separation of powers, in this view, was designed to prevent the usurpation of governmental power by private groups seeking to obtain distribution of wealth or opportunities in their favor; such private groups might use the authority of government to oppress.[98]   The separation of powers, then, was designed to protect minority groups against tyranny, since it was thought unlikely that a faction could gain control over all three branches of government simultaneously.[99]

Whichever rationale one brings to the issue of the *qui tam* provisions, I believe that the interplay between the Legislative and Executive Branches is entitled to some deference from the Judicial Branch. As one commentator recently observed:

> Just as the framers saw their structural choices as parts of a package separating legislative from executive power to protect liberty and avoid governmental tyranny, so should we view checks and balances doctrine as a package, its specific elements subject to revision to en-

sure fidelity to the constitutional premise of divided governmental powers.[100]

In other words, Congress's decision to allow the Executive to shift some of its law-enforcement authority to private citizens does not violate separation of powers principles particularly where the historical justifications for the principle, discussed *supra*, are not violated.  Indeed, in this instance, the rationales discussed above support the implementation of the *qui tam* provisions insofar as the provisions enable the Executive Branch to function more efficiently while not increasing the likelihood that Congress—or the Executive, for that matter—will tyrannically govern.[101]   Simply put, the discretion that the FCA grants the Executive Branch in no way implicates tyrannical behavior either by Congress or the President.  The FCA allows the President to carry that litigation forward which the Executive Branch deems worthy; all other cases it abandons to the devices of the relator, a circumstance which diminishes the fear of tyranny by leaving one whole class of cases outside the ambit of governmental control or concern.

## V

In addition to *Morrison*, which, despite the majority's best efforts to distinguish it, nonetheless rejected a separation of powers challenge to a statute more intrusive on Executive power than this one, several

**96.**  STONE ET AL., *supra* note 9, at 364.

**97.**  *Id.* at 364–65.

**98.**  *See* THE FEDERALIST No. 10, at 77–78 (James Madison) (Clinton Rossiter ed., 1961).

**99.**  Critics of this view opine that the separation of powers actually aggravates the problem of factions because it allows certain well-organized groups to block necessary regulations. *See* STONE ET AL., *supra* note 9, at 365.

**100.**  Abner S. Greene, *Checks and Balances in an Era of Presidential Lawmaking*, 61 U. CHI. L.REV. 123, 124 (1994).

**101.**  The theory of "ordered liberty," or, more precisely, the notion that separation of pow-

ers is part of a scheme designed to protect individual liberty from the encroachments of majoritarian politics, not as a constraint upon the efficient operation of government, also serves to support the notion that the *qui tam* relator provision does not violate the separation of powers.  *See* Rebecca L. Brown, *Separated Powers and Ordered Liberty*, 139 U. PA. L.REV. 1513, 1515–16 (1991) (" '[O]rdered liberty' analysis would have the Court examine governmental acts in light of the degree to which they tend to detract from fairness and accountability in the process of government. If the process is impaired in this way, then the action poses a threat to individual liberty.").

of our sister circuits have examined the *qui tam* relator provisions of the FCA for constitutional infirmities under the separation of powers doctrine and found them not to be wanting. In *United States ex rel. Kelly v. Boeing Co.*,[102] for example, the Ninth Circuit ruled that, taken as a whole, the *qui tam* relator provisions left the Executive Branch with a degree of control "indistinguishable from the degree of control the *Morrison* Court found the Executive Branch exercises over independent counsels."[103] While I might quibble with the exacting analogy to *Morrison*, I believe that the *Kelly* court's approach—to consider the net effect of the executive controls available under the *qui tam* provisions—is a defensible one. The better course is to view the Executive's action as a delegation of prosecutorial authority, but, in either case, the statute should be viewed as constitutional.[104]

## VI

Because I believe that the Executive and Legislative Branches came to such a compromise with the *qui tam* relator provisions of the FCA, and because the history of *qui tam* statutes supports their existence in this incarnation, I disagree with the decision rendered by the majority finding the *qui tam* statute unconstitutional. Additionally, because I believe that the Executive Branch appropriately delegated some its prosecutorial functions to the relator in this case, I would reverse the judgment of the district court.[105]   I dissent.

---

**102.** 9 F.3d 743 (9th Cir.1993).

**103.** *Id.* at 757.

**104.** *See also United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir.1994) ("The qui tam provisions adopted by Congress do not contradict the constitutional principle of separation of powers. Rather, they have been crafted with particular care to maintain the primacy of the Executive Branch in prosecuting false-claims actions, even when the relator has initiated the process."); *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1154–55 (2nd Cir.1993) (holding that FCA suits "do not constitute an intrusion into areas committed to other governmental branches" because, "in adjudicating FCA cases, courts further the Congressional purpose of augmenting executive enforcement of fraud cases").

**105.** Although I believe that *qui tam* relators are most certainly not "officer[s]" of the United States," U.S. CONST. art. II—largely for the same reasons that I contend that they do not violate the Take Care Clause—who must be appointed in accordance with the Appointments Clause, I do not address that issue at length above because neither the district court nor the majority grounded its opinion there.  I note only that the Supreme Court's jurisprudence establishes that, even if *qui tam* relators are officers of the United States, they are appropriately appointed by the Attorney General, since the clause provides that "the Congress may by Law vest the Appointment of such inferior Officers ... in the Heads of Departments."  *Id. Buckley v. Valeo* makes this point quite clearly: the Attorney General may make certain appointments because her office is "in the Executive Branch."  *Buckley v. Valeo*, 424 U.S. 1, 127, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam).  *See also Weiss v. United States*, 510 U.S. 163, 172–73, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994) (rejecting an Appointments Clause challenge to the appointment of military judges on the ground that the President himself, having appointed the officers in the first instance, was not required to make a "second appointment" of certain officers to the post of military judge); *Freytag v. Comm'r*, 501 U.S. 868, 891–92, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (rejecting an Appointments Clause challenge to a statute authorizing the chief judge of the Tax Court to appoint special trial judges because the Tax Court is a "Court of Law" recognized by the Appointments Clause).